Argued and submitted February 9, suspended March 23, 1982

In re Complaint as to the
Conduct of

DALE R. DRAKE,
*Accused.*

(OSB No. 79-74, SC 28166)

642 P2d 296

Asa L. Lewelling, Salem, argued the cause and filed a brief for accused.

Glen D. Baisinger, Lebanon, argued the cause for the Oregon State Bar. With him on the brief was Daniel A. Post, Albany.

PER CURIAM.

Tanzer, J., specially concurring opinion.

## PER CURIAM.

This case is before us upon a recommendation of the Disciplinary Review Board that the accused attorney, Dale R. Drake, be suspended from the practice of law for three years and thereafter until such time as he makes application for reinstatement upon a showing that he is fit to practice law. We decide the facts upon the record made before the Trial Board. *In re Robertson,* 290 Or 639, 642, 624 P2d 603 (1981). ORS 9.535(3).

On December 5, 1980, the Oregon State Bar filed a multiple count complaint against Drake. The first count alleged that Drake, on or about June 19, 1976,

"* * * borrowed the sum of $10,000.00 from his client, Merrill H. Gallagher. The Accused represented to Mr. Gallagher that the funds were being borrowed on behalf of another client of the Accused for ninety days. The Accused did not, at any time, disclose to his client the extent to which he was personally involved in the above transaction, nor did the Accused advise his client to seek independent counsel."

The second count contained this allegation:

"The Accused, Dale R. Drake, did not repay the loan within ninety days. On June 22, 1977, the Accused sent a letter to his client enclosing a check for $2,500.00 interest and a statement to the effect that the Accused had another client who needed money for an additional ninety days at the same rate of interest. The client went to the office of the Accused and told him he was not interested in making any further loans; he was told that the money had already been loaned out by then. On August 23, 1977, the client received a Promissory Note for $10,000.00, with principal and interest due and payable on demand. The client, Mr. Gallagher, made several demands after June 22, 1977, but only received $1,000.00 on September 21, 1978, $5,000.00 on October 16, 1978, $1,000.00 on February 14, 1979, and $1,500.00 on September 24, 1979. Throughout this period of time, the Accused repeatedly promised the client that the funds would be repaid in full within a short period of time."

The Bar claims that the foregoing conduct of the accused was in violation of the following Disciplinary Rules:

DR 1-102:

"(A)   A lawyer shall not:

"(4)   Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

DR 5-101:

"(A)   Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

DR 5-104:

"(A)   A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

DR 9-102:

"(B)   A lawyer shall:

"(4)   Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

Drake filed an answer admitting that he received $10,000 from Gallagher on or about June 19, 1976; that he did not advise Gallagher to seek independent counsel; that he gave his promissory note to Gallagher on August 23, 1977; and that payments on the note had been made. Otherwise, he denied the allegations of the complaint.

## FACTS ADDUCED AT THE HEARING

At a hearing before a Trial Board, ORS 9.525, evidence was produced as follows:

In 1976, Merrill Gallagher, a retired iron worker living in Salem, was 62 years old. With his wife, he owned his home; a cabin at Detroit; a lot, tavern, mobile home and five-bedroom home in Blue River, Oregon; and he had about $18,000 in the bank.

Prior to June of 1976, Drake had represented members of the Gallagher family, and had represented Mr. and Mrs. Gallagher in litigation involving the tavern in Blue River. The tavern had been purchased in 1973 or 1974.

Drake testified that the plaintiff in the tavern litigation was a sign company, and that the defendants were the original owners of the tavern, who tendered the defense to the Gallaghers, who accepted the defense. Drake testified that Gallaghers "* * * were in effect defendants in the suit." The sign company suit was dismissed on May 3, 1976.

Prior to June 3, 1976, Gallagher would come by from time to time and inquire as to the status of the litigation. Gallagher testified that he also consulted Drake about the possibility of getting a divorce.

On June 3, 1976, Gallagher went to Drake's office "* * * checking on some business, some other business." Gallagher told Drake that he was dissatisfied with the interest rate that he was receiving on the money deposited in the bank. Drake asked Gallagher if Gallagher had "* * * ever loaned out any money on real estate * * *." Gallagher testified that Drake told him that "* * * he had this customer, or this party, who was interested in $10,000 for 90 days' use of the money." Drake told Gallagher that this third person was "trustworthy," and that the loan would be repaid in 90 days at 25 percent interest. Gallagher agreed to loan the money, went to the bank and got a cashier's check for $10,000 made payable to Dale Drake. Gallagher testified that Drake "was going to give me a deed, or note, rather." Drake testified that, at or near the time of the delivery of the money to him, he prepared a promissory note for his (Drake's) signature, to evidence the loan. Drake testified that although he intended to deliver the note to Gallagher, because of oversight the note was never delivered to Gallagher.

The cashier's check which Gallagher obtained on June 3, 1976, bears the endorsement of Dale R. Drake. The back of the check also bears a stamp dated June 4, 1976, of the Bank of California, Portland. Drake at no time offered any evidence apart from his testimony to show that all or any part of the money had been delivered by him to any other person.

Drake testified that the money was in turn lent to a client named Dave Waldner. "* * * I had a client who was

a young whirlwind. He was involved in two or three businesses. He was involved mainly in the car business. He was building some spec houses."

"Q   What did you do when the cashier's check was delivered to you?

"A   Well, I executed it, or signed it on the back, and I think it was delivered by my secretary to Mr. Waldner, or she may have—I recall something about something due, or a payment at U. S. National Bank, and she may have gone to U. S. National and gotten two cashier's checks and given one for U. S. National and one for Mr. Waldner. I don't recall."

After the loan was made in June, 1976, in August, 1976, Drake undertook to represent Gallagher in Gallagher's divorce case. The tavern litigation had concluded no earlier than May of 1976. Drake continued to represent Gallagher in several other legal matters in 1977, 1978, 1979, and 1980.

The loan was not repaid within 90 days. One year later, on June 14, 1977, Drake wrote Gallagher as follows:

"Enclosed please find interest payments on your note.[1]

"If you desire to continue drawing the same interest, I have another situation where the people will pay the same amount of interest. I believe that it is a very good situation for you since it is approximately 18% higher that [sic] the banks.

"Call at your earliest convenience if you have any questions."

Promptly after receipt of the letter, Gallagher went to Drake's office and told Drake that he did not want to re-loan the money. According to Gallagher, Drake told him that he "* * * had already loaned the money out." Gallagher testified that Drake told him that he (Drake) had already loaned the money to some lumber brokers, at the same rate of interest, 25 percent.

At about this time, Drake delivered to Gallagher a promissory note dated June 15, 1977, in the amount of $10,000, which provided for payment on demand with interest at the rate of 25 percent per annum from June 15,

---

[1] A check drawn by Drake and made payable to Gallagher was enclosed with the letter of June 14, 1977.

1977, signed by Dale R. Drake. Full payment of this note has not been made.

## FINDINGS AND RECOMMENDATION
## OF TRIAL BOARD

After the hearing on May 14, 1981, on June 12, 1981, the Trial Board rendered a decision in which they made specific findings as follows:

1. That an attorney-client relationship existed between Drake and Gallagher "* * * for a considerable time before and after the alleged loan."

2. That "* * * the testimony of the accused is not credible * * *."

3. That the accused "* * * failed to advise the client to seek other counsel, to make a full disclosure of the person to whom and purpose for which the loan was to be made, and of the illegality and consequences of lending at an usurious rate of interest. * * *" That the accused had failed to keep a proper account of the sums received from Gallagher and had failed to return the money to Gallagher upon request.

The Trial Board concluded that Drake violated DR 5-101(A), DR 5-104(A), DR 1-102(A)(4), DR 5-105, DR 9-102(A) and DR 9-102(B)(3) [sic DR 9-102(B)(4)][2] and recommended that he be disbarred.[3]

---

[2] The Trial Board also found that Drake violated DR 5-105 and DR 9-102(A). The Bar's complaint made no claim that DR 5-105 or DR 9-102(A) had been violated and we will not consider those disciplinary rules in this opinion.

[3] The opinion of the Trial Board contains findings that

"(c) The accused failed to produce any files, office records, judgments, decrees or letters to establish dates. He did not produce as witnesses either Mr. Waldner, to whom he testified he gave the money, or the secretary who allegedly handled the matter of disbursing the money.

"(d) The only document to show the disposition of this large sum of money was the certified check given to the accused by Gallagher, which had an unrestricted endorsement of 'Dale Drake'. The accused stated his secretary went to the bank and got one or two Cashier's checks, one to pay an obligation to the bank and the other for Waldner.

"* * * * *.

"(h) The Board finds that the testimony of the accused is not credible; that it is not in accord with representations made in his letter of November 15, 1979, to the Oregon State Bar; * * *."

## FINDINGS AND OPINION OF THE
## DISCIPLINARY REVIEW BOARD

This matter was thereafter considered by the Disciplinary Review Board pursuant to ORS 9.535(1) and (2). On September 12, 1981, the Disciplinary Review Board issued a decision in which they concurred with the findings that the accused had violated DR 5-101(A), DR 5-104(A) and DR 1-102(A)(4). They found the accused not guilty of violating DR 9-102(B)(4). They recommended a three-year suspension.

## SUPREME COURT FINDINGS

Our findings, which are discussed in detail below, are:

1. Gallagher loaned Drake $10,000 in June of 1976 at 25 percent interest.[4]

2. At the time the loan was made a lawyer-client relationship existed between Drake and Gallagher.

3. At the time the loan was made Drake prepared, but did not deliver to Gallagher, a note to reflect Drake's promise to repay the money to Gallagher, with interest at 25 percent per annum.

4. Drake did not advise Gallagher that the loan constituted a business transaction in which they had differing interests, took no steps to protect his client, failed to advise the client to seek other counsel, and prepared no documents to adequately protect Gallagher relative to the investment.

5. Subsequently, Drake misrepresented the status of the loan, implying that the original loan had been repaid to Drake from the unnamed third person, and stating that the money had been re-loaned to another person.

---

Drake, in a letter to the Oregon State Bar dated November 15, 1979, made no reference to any loan to another client. The letter contains this statement:

"I did borrow $10,000.00 in June of 1976 at 25% Interest. I gave Mr. Gallagher a promissory note for the same."

[4] The fact that the money was to be re-loaned or delivered to an unnamed third person does not alter the fact that the loan was made to Drake, who testified that he prepared *his* note to give to Gallagher. By oversight, the note was not delivered at or near the time the loan was made.

## THE LAWYER-CLIENT QUESTION

■ Drake has consistently contended that at the time the loan was made, the relationship of attorney and client did not exist between Drake and Gallagher. We are convinced that a lawyer-client relationship existed.

When this matter first came to the Bar's attention, it wrote Drake and asked for a response. In his response to the Bar, Drake stated:

"* * * I would like to add I have known Mr. Gallagher for approximately ten years and have represented him on many occasions in the past. * * *"

The evidence shows that as recently as the previous month, May of 1976, Drake was handling litigation involving Mr. and Mrs. Gallagher. Gallagher testified that he came to see Drake in June of 1976 concerning his (Gallagher's) marital problems. In August of 1976, Drake undertook to represent Gallagher in the dissolution case which by that time had been filed by Mrs. Gallagher. Drake has argued that Mrs. Gallagher was "the principal client," that his representation of Gallagher was "for a limited purpose, i.e., the defense of litigation to which the Gallaghers were not parties. * * *." The evidence is clear, beyond any doubt, that although the Gallaghers were not named as defendants in the tavern litigation, they had assumed the defense of the defendants (by reason of their contract with the defendants) and Gallagher was, so far as the litigation is concerned, as much a party to the litigation as was Mrs. Gallagher. Drake argues that "* * * experience tells us that people frequently regard a lawyer acquaintance as 'their lawyer' based on past representation or friendship, when in fact the lawyer/client relationship does not exist." That statement may, in the abstract, be true, but it begs the question in the matter before us. There is direct, uncontroverted evidence that Drake was handling legal matters for Gallagher as late as May of 1976 and that by August of 1976, he had agreed to represent Gallagher in Gallagher's dissolution case. Gallagher testified that the loan conversation occurred while he was in Drake's office "* * * checking on some business, some other business." We have no doubt that Gallagher was Drake's client at that time and, as discussed below, was relying upon Drake's professional judgment incident to the making of the loan.

The relationship between lawyer and client is one of trust and confidence. The client's trust and confidence in the lawyer is, in many cases, an indispensable ingredient in the relationship. This observation of the Disciplinary Review Board is very much in point:

> "If Accused's contention is to be accepted, then the simple termination of a case creates an opportunity or period in which an attorney is freed from the rules governing attorney-client relationships. During this period the attorney would be free to use the rapport and confidence he had developed with his former client to persuade the former client to do things that would otherwise be prohibited by disciplinary rules governing client relationships. After these actions were completed, the attorney could then freely enter into a new relationship with the former client. The only important thing would be that the paperwork showing opening and closing dates of cases be kept in order. The attorney would point to these as proof the aggrieved party was not a client during the period in question."

*See In re Robertson,* 290 Or 639, 624 P2d 603 1981); *In re Galton,* 289 Or 565, 581, 615 P2d 317 (1980).

## DR 5-104(A)
## LIMITING BUSINESS RELATIONS
## WITH A CLIENT

The Code of Professional Responsibility is a set of rules of minimally acceptable lawyer conduct. We first examine the charge that Drake's conduct was in violation of DR 5-104(A).

■     DR 5-104(A) has four subparts. The first clause ["a lawyer shall not enter into a business transaction with a client"] contemplates (a) a lawyer-client relationship and (b) "a business transaction." As stated above, a lawyer-client relationship existed. A loan from the client to the lawyer of a substantial sum of money to be repaid within a given period of time certainly constitutes a "business transaction." A contract was created between Gallagher and Drake, which Drake promptly breached.

The second clause ["if they have differing interests therein"] refers to a business transaction in which the interests of the lawyer and the client are not identical. A

debtor-creditor relationship is an adverse relationship. Unquestionably, the interests of Gallagher and Drake were "differing interests."

The third clause ["and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client"] requires a showing that the client expected the lawyer to protect the client by the exercise of professional judgment. The complaint alleged that Drake "* * * borrowed the sum of $10,000.00 from his client * * * [and] represented to Mr. Gallagher that the funds were being borrowed on behalf of another client of the Accused * * *." Drake's own testimony confirms that he (Drake) was the debtor. Were this simply a loan between Gallagher and Drake with Gallagher looking only to Drake's *credit,* there would be a failure of proof as to the element of reliance upon the lawyer's "exercise of professional judgment." The evidence shows that to some extent, Gallagher was relying on Drake's advice as to the reliability of the third person (the unnamed third person was said to be "trustworthy") and the collectibility of the loan. As well, Gallagher was unaware that the loan was at a then usurious rate of interest and implicitly was relying on Drake's professional judgment. Gallagher was unaware that a usury defense might successfully be asserted to defeat collection of the amount loaned. Because of the rate of interest, the defense of usury could have been asserted by anyone against whom Gallagher might have sought to recover his money.[5]

The final clause ["unless the client has consented after full disclosure"] concerns the obligation of the lawyer to tell the client that (a) their interests in the business transaction are adverse, and (b) the existence of the differing interest has or may have effects upon the lawyer's ability "* * * to exercise his professional judgment therein for the protection of the client * * *." Ideally, the lawyer's "full disclosure" and the client's consent should be in writing.

---

[5] Although Drake testified that he felt morally bound, had he died or become incompetent his personal representative or conservator might successfully have avoided the payment of any interest by asserting that the interest rate was usurious, and Gallagher would have been unable to recover either the principal or a legal rate of interest. *See* ORS 82.010 (1975), amended in 1981, and ORS 82.120(5) (1975), repealed in 1981. Or Laws 1981, ch 412.

The client should be advised to seek outside counsel. *In re Bartlett,* 283 Or 487, 496, 584 P2d 296 (1978), contains this holding:

> "* * * Lest there be any doubt concerning that duty (to disclose) as being encompassed by DR 5-104, we now hold that in any situation in which a lawyer shall enter into a business transaction with his client where they have differing interests and the client expects the lawyer to exercise his professional judgment in that transaction for the protection of the client, the lawyer must *at least advise* the client to seek independent legal counsel. * * *" (Emphasis in original.)

■ The evidence clearly establishes a violation of DR 5-104(A). Not only was there no *full* disclosure, there was no disclosure at all. No consent was obtained. Lawyers would be well advised, if in doubt as to the existence of the lawyer-client relationship, to assume its existence, and govern themselves accordingly.[6]

## DR 5-101(A)

### REFUSING EMPLOYMENT WHEN THE INTERESTS OF THE LAWYER MAY IMPAIR INDEPENDENT PROFESSIONAL JUDGMENT

■ DR 5-101(A) requires a lawyer to refuse employment "[e]xcept with the consent of his client after full disclosure * * * if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests." The rule requires that employment be undertaken only after full disclosure *and* with the consent of the client.

---

[6] We also observe that Drake's "exercise of professional judgment" to protect his client was virtually nil. We have no doubt that, had Gallagher come in to see Drake about loaning $10,000 to some third person, the credit of whom was in doubt, Drake would have insisted upon some evidence of the debt, and in the exercise of his professional judgment might well have insisted upon some collateral to secure the loan. The interest rate was usurious under then-existing law. ORS ch 82 (1975). There was no disclosure to the client regarding the illegality of the interest rate, no documents were prepared to secure the debt, and the only document prepared to evidence the debt—the note—was never delivered to Gallagher. When an attorney is involved in a business transaction with a client in which they have differing interests, the existence of the differing interests renders the exercise of independent professional judgment difficult if not impossible, which is the reason for the rule.

Unquestionably, Drake's "own financial interests" were involved. The evidence is convincing that this financial interest affected Drake's exercise of professional judgment. As stated in footnote 6 and as discussed above (see discussion under DR 5-104(A)), Drake did virtually nothing to protect his client by obtaining a note to evidence the debt or by obtaining security. There was no disclosure of the illegality of the interest rate. Truly independent professional judgment can best be given in an atmosphere in which the lawyer is truly independent. Although DR 5-101(A) may well have primary reference to other financial, business, property or personal interests of the lawyer, the existence of a debt between the lawyer and client may, and in this case did, constitute such an interest and had an effect upon the lawyer's ability to exercise independent professional judgment incident to the loan transaction itself.

## DR 1-102(A)
## CONDUCT INVOLVING DISHONESTY, FRAUD, DECEIT OR MISREPRESENTATION

■ DR 1-102(A)(4) provides that a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. On June 14, 1977, Drake wrote Gallagher as follows:

> "If you desire to continue drawing the same interest, I have another situation where the people will pay the same amount of interest. I believe that it is a very good situation for you since it is approximately 18% higher that [sic] the banks."

Gallagher testified that after he received the letter, he went to see Drake and told him that he (Gallagher) wanted his money. According to Gallagher, Drake told him that he "had already loaned the money out." The name of the person to whom Drake had supposedly lent the money was not given. Drake disputes this testimony, but we resolve the testimonial dispute against Drake. The Disciplinary Review Board, in referring to Drake's letter of June 14, 1977, stated:

> "Accused's letter of June 14, 1977 to Gallagher states that Accused had 'another situation' where the people will pay the same rate of interest 'if you desire to continue drawing the same interest'. This implies that there was a

second borrower different from the first and that Gallagher had the option of terminating the lending agreement and getting his money back. However this was not the case. Accused testified that the money had not been repaid by the unnamed client, that he himself did not have the funds to repay it, and that he did not intend to tell Gallagher that the money had not been repaid. The Accused's June 14, 1977 letter was an attempt to deceive Gallagher as to the actual state of affairs."

We concur with the Disciplinary Review Board that Drake's conduct in June of 1977 was intended "to deceive Gallagher as to the actual state of affairs," and violated DR 1-102(A)(4).[7]

## CONCLUSION

The Trial Board found that Drake "* * * failed to produce any files, office records, judgments, decrees or letters to establish dates. He did not produce as witnesses either Mr. Waldner, to whom he testified he gave the money, or the secretary who allegedly handled the matter of disbursing the money." We, too, are concerned about the lack of such evidence. The Trial Board also found that Drake was "not credible."[8]

■     We, too, are concerned with Drake's credibility, for his credibility is properly considered in determining his innocence or guilt of the charges made and his fitness to practice law. An unethical lawyer who has done nothing to

---

[7] The Disciplinary Review Board concluded that no violation of DR 9-102(B)(4) had been shown. We concur with their analysis and conclusion:

> "DR 9-102(B)(4) generally refers to funds which are owned by a client but held by the attorney as trustee. In the case at hand, Accused entered into a debtor-creditor relationship with Gallagher. Had the funds been available to Gallagher in June 1977, as Accused's letter inferred they were, then Accused's failure to pay the money to Gallagher would have been a violation of the rule DR 9-102(B)(4) in his efforts to have Gallagher believe they had been repaid and reloaned. We find the Accused not guilty of violating DR 9-102(B)(4)."

[8] The Trial Board observed that the only evidence in the case that Drake re-loaned the money to anybody is his unsubstantiated oral testimony. He made no effort to call the third person to whom the money had been purportedly lent, nor did he call his secretary to verify her participation in the transaction. The $10,000 check which was delivered to Drake by Gallagher on June 3, 1976, is a cashier's check made payable to Dale Drake. The reverse side bears Drake's endorsement and shows that it was negotiated at the Bank of California in Portland, Oregon, on the following day, June 4, 1976.

conceal guilt or mislead the Trial Board and this court is a better candidate for continued practice of law than one who conceals the truth or tries to mislead the Trial Board and this court. In that sense, credibility is relevant alike to guilt and sanction. Unlike the Trial Board, however, we are not clearly and convincingly persuaded that Drake was "not credible." On this record, we are not convinced that he should be permanently disbarred.

■ We have found that Drake violated DR 1-102(A)(4), DR 5-101(A) and DR 5-104(A). The violation of DR 1-102(A)(4) is particularly significant because it involves dishonesty, fraud, deceit or misrepresentation. The appropriate discipline in this case is that Drake be suspended from the practice of law as a member of the Oregon State Bar for a period of three years from the effective date of this decision and thereafter until he has made application for reinstatement and until he shall affirmatively show that he is in all respects able and qualified to resume his position as a member of the Bar of this state and that his resumption of the practice of law will not be detrimental to the Bar or to the public interest.

The Oregon State Bar is also awarded judgment for its costs and disbursements.

Tanzer, J., filed a specially concurring opinion in which Linde, J., joined.

**TANZER, J.,** specially concurring.

I write separately because I do not believe the majority's disposition adequately protects the public or promotes public confidence in the legal profession.

The 1976 and 1977 incidents should be separately considered. Each is a separate instance of intolerable professional conduct. In my view, in the absence of extenuation, either is cause for permanent disbarment because each involves dishonesty to a client regarding his funds.

### The 1976 Loan

The Bar showed that the accused solicited a loan from Gallagher, telling him it was for an unnamed client, and received the money. There is no documentation or other evidence to suggest that the accused transmitted the

money to any client. In the normal course of business, such documentation would exist. This leaves the inference that the money stopped at the accused and that the accused lied to his client, Gallagher. Obtaining money from a client by false pretenses is a grievous breach of professional conduct.

That inference is not successfully rebutted. The accused attempted to rebut the inference by testimony regarding a client, Waldner, who engaged in short-term, speculative business deals. His testimony is the first introduction of Waldner's name into these proceedings or the preceding investigation. There is no documentation of payment of $10,000 to Waldner. The accused has had time to find Waldner and call him as a witness, but has not done so, has shown no effort to do so, and did not request a continuance in which to do so. The accused's conduct is not that of a person who knows of an exculpatory witness. Instead, he testified that he did not remember the circumstances of the transaction, but that his former secretary actually gave Waldner the $10,000, apparently in cash. He did not call her as a witness, did not assert that she was unavailable, and made no showing that he had attempted unsuccessfully to obtain her testimony. Again, this is not the conduct of an accused person who expects a witness to provide exculpatory testimony. The accused's testimony regarding Waldner has all the earmarks of recent fabrication.

The Trial Board, which observed the accused testify, found:

"The Board finds that the testimony of the accused is not credible; that it is not in accord with representations made in his letter of November 15, 1979, to the Oregon State Bar; it is in conflict with the written evidence * * *."

My reading of the transcript confirms that finding and causes me also to find that the accused's testimony is false. His false testimony fails to rebut the inference that the accused solicited $10,000 from his client by use of false pretenses and kept the money for his own purposes.[1]

---

[1] The Trial Board also noted that even under the accused's version of the 1976 loan, he admittedly acted contrary to the interests of the client by encouraging him to make an unsecured, undocumented usurious loan to an unnamed debtor who was at best a poor risk.

The majority finesses this by a cryptic finding that Gallagher loaned the money to the accused, without reference to whether it went on to Waldner. I would find that the accused falsely solicited and obtained the loan on his own behalf.

## The 1977 Incident

The reluctance of the majority to come to a specific finding as to disposition of the 1976 loan should not detract from our recognition of the gravity of the 1977 transaction. The latter transaction, standing alone, sufficiently reflects dishonesty in the lawyer-client relationship to warrant more than a three-year suspension.

When Gallagher inquired about his 90-day loan, a year after it was made, the accused lied to him about the disposition of the money. The accused wrote that he had loaned it to another client. In fact, the money had never been loaned to a client or (if the accused is to be believed) it was still loaned to the same client, Waldner, who had not paid it back, who had gone broke and whose meager assets were tied up in tax liens. Either way, the accused deliberately lied to his client in 1977 about his handling of the client's funds and their whereabouts. That act is utterly inconsistent with the maintenance of public trust in the legal profession.

## Conclusion

In *In re Pierson,* 280 Or 513, 571 P2d 907 (1977), we said

"* * * a single conversion by a lawyer to his own use of his client's funds will result in permanent disbarment." 280 Or at 518.

This accused's conduct is at least as culpable as that in the *Pierson* case. It is equally intolerable professional conduct, and it is equally deleterious to public safety and public confidence. This record discloses no extenuation. This is not a case of inexperience or a lapse of judgment due to mental or emotional problems with which the accused is effectively dealing. Nor does the accused face up to his conduct and profess a repentant intention never to repeat it. Any such circumstances might allow us to conclude that the public would be adequately served by a less

severe sanction. Here, however, there is only evidence of lying to a client and using his money improperly.

I take no pleasure in assuming a position separate from my associates but, as for me, I shall vote to permanently disbar lawyers guilty of dishonesty to clients regarding clients' funds unless there are extenuating circumstances. I do not do so as a matter of leniency or harshness, but rather of the responsible exercise of our public trust in the regulation of licensure to practice law.

Justice Linde agrees that the accused's admitted misrepresentation concerning the relending of Gallagher's money in 1977, when Gallagher clearly was a client, justifies disbarment in the absence of mitigating circumstances, without regard to the original 1976 transaction.

Linde, J., joins in part in this opinion.