Argued and submitted March 5, accused reprimanded April 6, 1982

In re Complaint as to the
Conduct of

# KENNETH M. MONTGOMERY,
*Accused.*

(OSB No. 80-53,　SC 28251)

643 P2d 338

William B. Crow, Portland, argued the cause for accused. With him on the brief was Miller, Nash, Yerke, Wiener & Hager, Portland.

S. Ward Greene, Portland, argued the cause for the Oregon State Bar. With him on the brief were Marjorie Anne Speirs, and McMenamin, Joseph, Babener, Greene & Perris, Portland.

PER CURIAM.

## PER CURIAM.

This is an attorney discipline case involving a loan from the client to the lawyer. We find that the accused lawyer, Kenneth M. Montgomery, violated DR 5-104(A), and we impose a public reprimand.

Montgomery practices law in Portland. MacLellan and Farnham were two of the three principal owners of a corporation, BLT Enterprises, Inc. Montgomery represented BLT on an ongoing basis. He also represented MacLellan and Farnham on some personal matters and was personally involved in other business ventures with Mac-Lellan. The third principal in BLT was a man named Thompson, who was inactive in the management of BLT. Both MacLellan and Farnham were highly competent in their fields. MacLellan handled the business and financial end of the corporation, and Farnham was largely responsible for the other operations of the company.[1]

Prior to 1979, Montgomery made an unsuccessful investment and he needed cash. From previous discussions MacLellan was aware that Montgomery needed cash. Montgomery testified that after he was turned down by a bank he asked MacLellan whether BLT would be interested in lending him $20,000 for 45 days at a 20 percent annual interest rate, a then usurious rate of interest. See ORS 82.010 (1979), amended in 1981, and ORS 82.120(5) (1979), repealed in 1981. Or Laws 1981, ch 412. Montgomery knew that the rate was usurious. MacLellan did not.

Montgomery testified that he knew that if usury were asserted as a defense the interest would be uncollectible and the principal forfeited to the common school fund. He also understood the risks of making an unsecured loan. None of these facts were disclosed to MacLellan or to BLT prior to the time that the loan was made.

---

[1] MacLellan has an impressive, successful record in business. BLT operated a number of restaurants. Farnham testified, "* * * [Y]ou would have to stretch your imagination to say I know a whole lot about any of the financial aspects of what's going on. I know a lot about hamburgers." MacLellan described Farnham's operational capabilities, "* * * [O]n a scale of one to ten, he's a fourteen."

MacLellan was highly sophisticated in business and financial matters and routinely handled large financial transactions without consulting Farnham or Thompson. However, in view of the unique nature of this loan, he consulted with Farnham and obtained Farnham's approval before lending the money to Montgomery.

Montgomery prepared and delivered a handwritten note. For some unexplained reason, the note is not in evidence. The note was not paid within the 45 days. Thereafter, the principals in BLT had a falling out, separate counsel were obtained, and the matter was reported to the Oregon State Bar.[2] A complaint was filed charging that Montgomery violated DR 5-104(A), which provides (the Arabic numbers are ours, and do not appear in the disciplinary rule itself):

> "A lawyer shall not [1] enter into a business transaction with a client if [2] they have differing interests therein and if [3] the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless [4] the client has consented after full disclosure."

DR 5-104(A) contains four clauses. The first three clauses define the prohibition: entering a business transaction with a client if the client has a differing interest in the transaction and expects the lawyer to exercise independent professional judgment for the client's protection. The "unless" clause—clause 4—permits such conduct if the lawyer (a) makes "full disclosure" and (b) obtains the client's consent.

The Trial Board found that BLT and MacLellan "* * * implicitly relied on Montgomery's legal expertise regarding this transaction because no other counsel was available * * *" and that Montgomery should have disclosed four things to MacLellan:

> "(1) his own poor financial condition, (2) the hazards of lending money without obtaining proper security therefore, (3) that the note between himself and BLT was

---

[2] As required by DR 1-103(A), the matter was reported to the Bar by the lawyers who subsequently represented the principals in BLT. DR 1-103(A) provides:

> "A lawyer possessing unprivileged knowledge of a violation of DR 1-102 shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation."

usurious, and (4) that usury could be asserted as a defense to payment of the note."

The Trial Board recommended that Montgomery be reprimanded.

The Disciplinary Review Board concluded that Montgomery had not violated DR 5-104(A), saying:

"We would comment that insistence upon independent legal advice would seem appropriate in any such case where the lawyer and client are to become involved in a business transaction about which the lawyer has superior or even equal knowledge or experience. However, when the experience and knowledge of the client about the particular business transaction exceeds that of the lawyer (as in this case) and the business transaction is not peculiar to the law or one trained in the law, independent advice may not be necessary. If the client's knowledge and experience with the particular business transaction is shown to far exceed that of the lawyer and the client did not expect the lawyer to exercise his or her professional judgment therein for the protection of the client, we cannot conclude there was a violation of Disciplinary Rule 5-104(A). To conclude otherwise would preclude any lawyer from securing a loan from a loan officer of any bank he or she represented without insisting the bank seek independent legal advice. Opinion 158 of the Committee on Legal Ethics supports the idea that occasionally lawyers don't have *all* the knowledge in the business world. We cannot presume or conclude that the profession's knowledge or expertise in such matters is so unique or exclusive and we believe Disciplinary Rule 5-104(A) was drafted with these exceptions in mind." (Emphasis in original.)

There is no question that Montgomery entered into a business transaction with a client and that they had differing interests therein. Montgomery concedes that the requirements of clauses (1) and (2) of DR 5-104 have been met. The determinative question is whether a violation of the third clause has been made out, that is, whether there is clear and convincing evidence that the client expected the lawyer "* * * to exercise his professional judgment therein for the protection of the client * * *."

Prior to this transaction, BLT had loaned money to its employees at low rates of interest. There is no question that BLT, MacLellan and Farnham viewed this

loan simply as a business loan and that BLT was aware of Montgomery's somewhat precarious financial situation. In that sense, we agree with the Review Board's conclusion that BLT was not relying upon Montgomery for any advice regarding the creditworthiness of the borrower. Even so, we are convinced that the lender was relying upon Montgomery's exercise of professional judgment, at least to the extent that (a) the loan was valid and legally enforceable, and (b) that the documents prepared by him were in proper form and evidenced a legally enforceable obligation.

MacLellan was a sophisticated businessman with (quoting from Montgomery's brief) "* * * far greater business experience and knowlege than [Montgomery]." And true, MacLellan testified that he "* * * would not have gotten another attorney involved in a minor transaction like that." But that analysis is incomplete.

MacLellan testified:

"Q BY MR. CROW: If Ken had said to you at the time he requested the loan or at any time prior to making the loan, that you should seek the advice of another attorney, what would your reaction have been? What would you have done?

"A If the same thing were repeated tomorrow or today, *I would have probably asked him why. Why would I need an attorney for this transaction? And based on what the response would be,* based on the track record before and after that particular transaction, I wouldn't have gotten another attorney for a $20,000 note." (Emphasis added.)

When a lawyer regularly represents a financial institution such as a bank, savings and loan association or finance company, and applies for a loan of a type which the client makes in the normal course of business, it may be that the lawyer need not advise the client to seek independent legal counsel or otherwise advise the client in the transaction. But that is a markedly different situation from the case at bar, for there the client is knowledgeable in all phases of the business transaction involved and no more expects professional judgment from the lawyer than it does in any other regular loan transaction with a borrower. It is clear that there is no expectation that the lawyer

will "exercise his professional judgment for the protection of the client" because the client is already fully informed.

But that is not the situation here. Even though MacLellan was generally knowledgeable in business and financial matters, he was virtually unaware of the consequences of making a loan at a usurious rate of interest. The transaction was not "regular," in the sense that a loan from a bank or savings institution is regular, and it is inescapable that there was an expectation, unspoken but real, that the transaction was valid and enforceable. The key is found in the response quoted above, "* * * *I would have asked him why* [I should consult another lawyer]," which confirms the unspoken but existing belief on the client's part that the transaction was what the client believed it to be—a loan at a favorable rate of interest which was legally enforceable.

■ When a lawyer borrows money from a non-lawyer client who is not in the business of lending money, the lawyer should assume that the client is relying on the lawyer for the legal aspects of the transaction to the same extent that the client would rely on the lawyer for advice were the client making the loan to a third person, unless the opposite is expressly stated.

It would not occur to a trusting client that the lawyer would advise the client to enter into an unlawful contract. Thus, had BLT consulted Montgomery about a loan to a third person, although advice as to the creditworthiness of the third person would likely not be expected, advice as to the legal effect of the usurious rate of interest would likely have been given. In addition, a competent lawyer might have recommended that security be given by the borrower.

In many situations the client would not be dealing with the lawyer but for the client's trust and confidence in the lawyer born of past associations. This trust is indispensable in some lawyer-client relationships. Requiring the lawyer-borrower to assume that the client is relying on the lawyer as to the legal aspects of the transaction is consistent with the realities of the situation, and perhaps more importantly, will tend to maintain a healthy, above-board relationship between the lawyer and the client with maximum protection to the client.

■ The evidence in this case is clear that MacLellan was unaware of the significance of the usurious interest rate. We are convinced that had Montgomery advised him of the consequences of usury, or had MacLellan sought outside legal advice, the loan in this form would not have been made. We find that the requirements of the third clause have been met.

Although we are convinced that Montgomery would not have asserted a usury defense, that is beside the point, for as we observed in *In re Drake,* 292 Or 704, 642 P2d 296 (1982), which also involved a loan at a usurious interest rate:

> "Although Drake testified that he felt morally bound, had he died or become incompetent his personal representative or conservator might successfully have avoided the payment of any interest by asserting that the interest rate was usurious, and Gallagher would have been unable to recover either the principal or a legal rate of interest. * * *"

■ If the situation described in clauses (1), (2) and (3) of DR 5-104(A) is shown to exist, then the business transaction cannot be concluded "* * * unless the client has consented after full disclosure." One way for consent to be obtained is by having the client obtain outside counsel, for as we stated in *In re Bartlett,* 283 Or 487, 496, 584 P2d 296 (1978):

> " '* * * Lest there be any doubt concerning that duty (to disclose) as being encompassed by DR 5-104, we now hold that in any situation in which a lawyer shall enter into a business transaction with his client where they have differing interests and the client expects the lawyer to exercise his professional judgment in that transaction for the protection of the client, the lawyer must *at least advise* the client to seek independent legal counsel. * * *' " (Emphasis in original.)

If the advice to seek outside counsel has not been given, or though given has not been taken, then the lawyer must make "full disclosure." In this case, full disclosure would require the type of advice which a prudent lawyer would be expected to give the client if the client consulted the lawyer regarding such a loan to a third person.[3]

---

[3] In order to discourage lawyers from borrowing from their clients, we restate this sentence from *In re Drake,* 292 Or 704, 642 P2d 296 (1982):

We restate our conclusions regarding the third and fourth clauses of DR 5-104(A). As to clause (3)—"if the client expects the lawyer to exercise his professional judgment therein for the protection of the client"—when a lawyer seeks to borrow money from a non-lawyer client who is not in the business of lending money, the lawyer must assume, in the absence of contrary expression by the client, that the client is relying on the lawyer for professional judgment to the same extent that the client would rely on the lawyer for advice had the client consulted the lawyer concerning such a loan to a third person. As to clause (4)— "unless the client has consented after full disclosure"—if advice to seek outside counsel has not been given, or if given has not been taken, the lawyer should give the client the advice which a prudent lawyer would be expected to give the client if the client consulted the lawyer regarding such a loan to a third person.[4]

---

"Truly independent professional judgment can best be given in an atmosphere in which the lawyer is truly independent."

When one borrows money from a client, it is more difficult to give independent advice, for the lawyer's judgment may be impaired by self interest.

[4] *Compare* DR 5-101(A), which prohibits a lawyer from accepting employment without full disclosure and consent "* * * if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests." *In re Drake*, 292 Or 704, 642 P2d 296 (1982), also involved a loan from a client to his lawyer. We held that both DR 5-104(A) and DR 5-101(A) had been violated. As to DR 5-101(A), we stated:

"Unquestionably, Drake's 'own financial interests' were involved. The evidence is convincing that this financial interest affected Drake's exercise of professional judgment. As stated in footnote 6 and as discussed above (see discussion under DR 5-104(A)), Drake did virtually nothing to protect his client by obtaining a note to evidence the debt or by obtaining security. There was no disclosure of the illegality of the interest rate. Truly independent professional judgment can best be given in an atmosphere in which the lawyer is truly independent. Although DR 5-101(A) may well have primary reference to other financial, business, property or personal interests of the lawyer, the existence of a debt between the lawyer and client may, and in this case did, constitute such an interest and had an effect upon the lawyer's ability to exercise independent professional judgment incident to the loan transaction itself."

*See also In re Tonkon*, 292 Or 660, 642 P2d 660 (1982), for a discussion of DR 5-101(A).

Montgomery has violated DR 5-104(A) and should be publicly reprimanded. This opinion will stand as that reprimand.

Costs to Oregon State Bar.