Argued and submitted November 1, accused suspended November 29, 1983

In re Complaint as to the Conduct of

# JAY W. WHIPPLE,
*Accused.*

(SC 29728)

673 P2d 172

Robert P. Van Natta, St. Helens, argued the cause for the accused. With him on the brief was Van Natta & Petersen, St. Helens.

Larry Brisbee, Hillsboro, Oregon, argued the cause and submitted the brief for Oregon State Bar.

PER CURIAM

## PER CURIAM

This is an attorney discipline case involving a loan from a client to the lawyer. The lawyer is accused of violating DR5-104(A) which provides:

> "A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

In both *In re Drake,* 292 Or 704, 642 P2d 296 (1982) and *In re Montgomery,* 292 Or 796, 643 P2d 338 (1982) we analyzed the violation of DR5-104(A) by dividing the rule into four elements. The first three parts of the rule deal with the general prohibition of lawyers entering into business transactions with a client if the client has a differing interest in the transaction and expects the lawyer to exercise independent professional judgment for the client's protection. We are concerned here with the fourth element of the rule, "unless the client has consented after full disclosure." The primary question in this case is whether the accused adequately advised his client to seek out and obtain independent legal advice regarding the loan and whether the accused disclosed disadvantageous aspects of the loan to the client.

Between 1974 and 1979 the accused represented Henry primarily in matters involving wills for Henry and his wife and the drafting of a deed creating a tenancy by the entirety. In July, 1979, Henry asked the accused to represent him in a dissolution of marriage proceeding. As a part of the dissolution matter, the family residence was sold and the proceeds divided between Henry and his wife with Henry's share being $25,000. Thereafter, there was discussion between Henry and the accused about what Henry intended to do with the money and the parties agreed to an unsecured ninety day loan to the accused in the amount of $20,000. A promissory note was prepared by the accused which provided for interest at the rate of sixteen percent per annum.[1] It was signed by the accused and his wife. When the accused was unable to repay

---

[1] At the time of the loan sixteen percent interest exceeded the statutory maximum for interest rates on this kind of loan. *See* ORS 82.010 (1979), amended in 1981, and ORS 82.120(5) (1979), repealed in 1981. Or Laws 1981, ch 412 § 24.

the loan, Henry sought other counsel. A default judgment was taken against the accused on the note. This disciplinary proceeding ensued.

The Bar maintains that the accused failed to inform Henry that (1) at the time of the loan, the accused was in serious financial difficulty, (2) because of the usurious interest rate there was a potential that the loan was legally unenforceable, (3) a loan made at a usurious interest rate carried with it the potential that the principal of the loan could be forfeited to the county school fund, and (4) there were significant hazards in making an unsecured loan as opposed to a secured loan.

The testimony of Henry is as follows:

"Q. [Lawyer for the Bar] At that time, did he give you any advice or talk with you at all about the risks associated with making an unsecured loan?

"A. No, not in talking about this and it asked — it was a demand note and it was placed at the bottom about the collection, payment on his behalf. I thought that was neat, not knowing more about it than that, it looked good to me. So, anyway it looked all right to me.

"Q. Did he at any time suggest to you that you should seek out and obtain another lawyer, independent legal advice to advise you about whether you should enter into this arrangement with him?

"A. He didn't ask me if I wanted to, he — he didn't say that I should. He may have asked that, but I don't remember. He may have asked if I wanted to and I said, 'No, you're the lawyer, it looks all right to me, you should know what you have done.' He didn't demand or ask me to make an appointment.

"Q. Now, at that time your divorce was still pending, is that right?

"A. Yes.

"Q. And when he gave you the note, were you relying upon him to exercise his professional judgment in protecting your money with this note?

"A. Yes, definitely.

"Q. Did you expect that that note would be legal and valid and enforceable?

"A. Oh, definitely, yes.

"* * * * *

"Q. Did Mr. Whipple ever advise you prior to the time that he gave you that note that 16 per cent interest rate violated the State usury laws?

"A. Definitely not.

"Q. Did he advise you at all that in making a loan at the rate of 16 per cent interest that you, as the lender, had a potential risk of forfeiture of the entire principal and interest on that loan?

"A. No, certainly not.

"Q. And if it was forfeited it would go to the County School Fund?

"A. I never heard anything about it until later.

"* * * * *

"Q. As I understand it, he did not advise you of any financial difficulties that he might be having —

"A. No, other than he couldn't collect the money. I didn't realize that there would be any problems.

"* * * * *

"Q. Now Mr. Henry, when you made the loan to Mr. Whipple, did you believe that he was your lawyer representing your interests?

"A. Yes, I believed that, yeah. He was working with me. And things were not exactly finalized yet. And so, I was checking with him and I considered him my lawyer, yes."

The testimony of both Henry and the accused indicates that Henry was desirous of placing his money where he could realize a better rate of interest than at the credit union where he had deposited it. The testimony is in conflict whether Henry or the accused took the initiative in proposing the loan.

The accused testified as follows:

"A. And he said — again, I'm not quoting him exactly, but he said, 'Isn't that an illegal rate of interest?'

"THE CHAIRMAN: He said it?

"THE WITNESS: Yes, and I said — I thought that probably it was usury according to the law except that I had been reading something about the President and the Governor and everybody suspending the usury law because it was preventing investment of private money. And he said, 'Yes,' he had been reading something like that, too.

"So, I didn't know quite where that was at that point, but that — that shouldn't be a problem between us because I would borrow it at that rate and usury could be used as a defense in the note but I wouldn't use it as a defense.

"We didn't discuss usury again that time, that was on January 31st.

"I told him that I wasn't in a position to give any kind of security for the note at that time.

"* * * * *

"A.  He seemed to know that a secured loan was a better loan than to have an unsecured loan. And I told him that ordinarily I wouldn't borrow that kind of money without offering some kind of security. But at this point, I didn't have really any security to give. I was in the process of refinancing everything, which was what I was doing. And we wouldn't just have a deal if there was going to be any security.

"I think that's basically the way it went. I told him that — the expression I used was that the money goes where the risk is and there is more risk with an unsecured loan than there is with a secured loan. And for that reason, interest rates are higher on unsecured loans than are on secured loans. And what he was interested in was the higher interest.

"* * * * *

"A.  I told him that if he had any question at all about this because that struck me as kind of a negative note on his part when he was asking about security and after all, I had already told him I wasn't offering security. And I said if you have any question about this at all, you should not enter into it, you should talk to anyone he wanted to, he could talk to his mother again or his friends in Hillsboro or he could go talk to another lawyer, whatever he wanted, if he had any hesitancy at all, any reluctance because he had been — well, we had liked each other and I didn't want to enter into anything where he would feel uncomfortable about it.

"And he said no, he was — he felt very comfortable about it. So, I told him that it was — the interest rate was on its face usurious and I didn't quite know what the status of the law was at that point, that usury could be used as a defense. I didn't tell him that interest would be paid to a common school fund because — anyway, I mentioned that if it was defended on the basis of usury it's possible that he would be able to collect. But, I told him I wouldn't do that, I just flat out wouldn't do that. And that in my experience it had been that

there were a lot of loans outstanding to private individuals that were in excess of the legal rate at that time.

"* * * * *

"Q.   [Lawyer for accused] At anywhere along the line did you tell Mr. Henry in connection with this transaction you could not be his lawyer?

"A.   [Accused] Yes at least on the occasions when coming to my home when the note was signed I said to him — after we had talked about it for about 20 minutes I said, 'Well, you must understand I represent you in a deal that you're making with me, that I can't be your attorney in this transaction because I'm here representing myself.'

"* * * * *

"Q.   If Mr. Henry had come to you as your attorney in connection with this transaction and outlined for you what you have told this court happened as far as the circumstances are concerned would you have advised him any differently than what was done here?

"A.   You mean prior to his actually loaning the money?

"Q.   Yes.

"A.   Well, certainly I would have discussed it with him differently because we would have been talking about a third party rather than myself. When I say differently, I don't mean that I would have gone into the subjects — into different subjects, I wouldn't have discouraged him. I don't believe I would have encouraged him. I would have asked him questions to try to see if he knew what he was doing and then ask — told him that it would be up to him whether he wanted to go ahead or not. In answer to my questions, he had told — he had described to me a lender who was essentially in the same position that I was in.

"Q.   Like you are now?

"A.   Yes, I would have said, 'Well, it's going to have to be up to you. If you feel comfortable about making that loan with no security, then, it looks like the capacity to repay is there and if you want to take what risk there is by there not being any security, I think that is your decision.'

"I would have discussed with him the security aspect and the usury aspect. And I probably would have said those things differently than I said to him, but the subjects would have been the same."

The accused also testified that at the time of the loan he was delinquent on mortgages on one of the buildings he owned and that a balloon payment was due on his residence but that he did not tell Henry because he had made arrangements with the lenders to continue to make payments.

Other testimony of the accused that is pertinent is as follows:

"Q. [Lawyer for the Bar] Well, do you think it reasonable for Mr. Henry to expect that incident to this loan that you would prepare a document that would be legally enforceable and valid on its face?

"A. Do I think it reasonable for him to —

"Q. To expect that you would prepare a document that was legally enforceable and valid?

"A. Yes.

"Q. Did you feel that you had an obligation to protect him insofar as his money was concerned?

"A. Well, yes and no. I felt that I had an obligation to — if I entered into any relationship with him first I would have an obligation to pay that money back because the obligation we're talking about was repayment of funds. And secondly, I have an obligation to keep nothing from him. And then he had a duty to make up his own mind."

There follows testimony regarding whether the accused would advise a client that a loan he is considering entering into is a "bad deal" because of a usurious interest rate. The accused's answers are equivocal but generally indicate that he would not necessarily counsel a client not to enter into a usurious loan.

Considering the above testimony as well as the entire testimony presented in the transcript we conclude the accused did not make a full disclosure to Henry as required by DR5-104(A) before entering into the loan agreement. We said in *re Drake, supra:*

"The final clause [ 'unless the client has consented after full disclosure'] concerns the obligation of the lawyer to tell the client that (a) their interests in the business transaction are adverse, and (b) the existence of the differing interest has or may have effects upon the lawyer's ability '* * * to exercise his professional judgment therein for the protection of the client * * *.' Ideally, the lawyer's 'full disclosure' and the client's consent should be in writing.

"The client should be advised to seek outside counsel. *In re Bartlett,* 283 Or 487, 496, 584 P2d 296 (1978), contains this holding:

" '* * * Lest there by any doubt concerning that duty (to disclose) as being encompassed by DR 5-104, we now hold that in any situation in which a lawyer shall enter into a business transaction with his client where they have differing interests and the client expects the lawyer to exercise his professional judgment in that transaction for the protection of the client, the lawyer must *at least advise* the client to seek independent legal counsel. * * *' " (Emphasis in original.) 292 Or at 714-15.

The accused testified that he suggested to Henry that he talk to his mother or his friends or another lawyer and that he specifically told Henry he could not be his lawyer in this transaction. This was not adequate. The accused failed to inform Henry of his financial situation, the potential consequences of entering into a loan at a usurious interest rate and the hazards associated with making an unsecured loan. The accused is guilty of violation of DR5-104(A).

We now consider the appropriate sanction. The Trial Board recommended a public reprimand but the Disciplinary Review Board, relying on *In re Drake, supra,* and *In re Scannell,* 289 Or 699, 617 P2d 256 (1980), recommends a suspension from practice for two years. We think the case at bar is distinguishable from *Drake* and *Scannell.*

In *Drake,* in which a three year suspension from the practice of law was imposed, the accused lawyer borrowed money from his client for the purpose of loaning it to a third person. It was to be repaid in ninety days at twenty-five percent interest. Although a promissory note was prepared by Drake, it was not delivered to the client. The loan was not repaid within the ninety days. One year later Drake made an interest payment and also suggested to the client that he had another party interested in using the money at the same rate of interest. The client told Drake he was not interested in a reloan, but Drake informed the client he had already made the loan to a third party. At this point a demand note was executed by Drake but at the time of the hearing it had not been paid. We concluded that Drake had not only violated DR5-104(A) but that he also had violated DR5-101(A) which requires a lawyer to refuse employment "[e]xcept with the

consent of his client after full disclosure * * * if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests." In addition, we found Drake had violated DR1-102(A)(4) which provides that a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation and we thought that to be particularly significant to the imposition of a three year period of suspension.

In *Scannell,* which involved a violation of DR5-104(A), we suspended the accused from the practice of law for a period of sixty days followed by a two year period of probation during which the accused could not engage in the representation of private clients. The latter condition was in recognition that the accused was at the time employed by the Department of Justice. Scannell obtained a loan from a client and used the money to pay off a land sale contract on a building owned by Scannell. A deed to the client for the property was prepared but it was never recorded. Scannell then purchased another building; again a deed to the client was prepared but was not signed or recorded. The client was never advised to seek independent legal counsel. Noting that Scannell had left private practice, we said,

"* * * [T]he disciplinary system does not exist for the purpose of punishment for wrongdoing but to protect the public and the administration of justice. It does so directly by temporarily or permanently disqualifying unethical or careless attorneys from the practice and indirectly by the deterrent effect of enforcement in maintaining the Bar's sensitivity to questions of professional responsibility." 289 Or at 703.

We concluded it was appropriate to the violation "that the accused not deal with private clients for an extended period more than that he be disqualified from any legal work whatsoever." *Id.*

We imposed only a public reprimand in *In re Montgomery, supra,* for violation of DR5-104(A) after the Trial Board recommended a reprimand and the Disciplinary Review Board concluded there had been no violation of the rule. There the question turned on whether there was clear and convincing evidence that the client expected the lawyer "* * * to exercise his professional judgment therein for the

protection of the client * * *." Because the lenders were astute, knowledgable, successful businessmen the Disciplinary Review Board concluded that there was no reliance upon Montgomery for advice regarding the creditworthiness of the borrower. We agreed with that but concluded that because these lenders were not in the business of making loans, they were not expected to know of the consequences of making a loan at a usurious rate of interest. We said:

"When a lawyer borrows money from a non-lawyer client who is not in the business of lending money, the lawyer should assume that the client is relying on the lawyer for the legal aspects of the transaction to the same extent that the client would rely on the lawyer for advice were the client making the loan to a third person, unless the opposite is expressly stated." 292 Or at 802.

We indicated that a lawyer advising a client about making a loan to a third person would inform the client about the potential effects of a usurious rate of interest as well as the hazards of making an unsecured loan. Because the loan in *Montgomery* would not have been made if the lenders had known of the implications of a usurious interest rate and Montgomery did not advise them of that, we held there was a violation of DR5-104(A). There is no indication in the opinion why only a public reprimand was imposed rather than a period of suspension.

We noted recently in *In re Boyer,* 295 Or 624, 669 P2d 326 (1983) the disparity in sanctions involving violations of the Disciplinary Rules relating to conflict of interests but we said the disparity is accounted for by the particular circumstances of each matter. While we imposed a seven months suspension in *Boyer* we said: "We note, however, that this particular type of unethical conduct appears to be on the rise. Deterrence thereof for the public good may be accomplished by more severe penalties for this kind of unprofessional conduct which may occur after the date this opinion is published." 295 Or at 630.

Because the conduct in question in this case occurred before the *Boyer* decision and because we do not consider the facts of this case to be as egregious as those in *Drake* and *Scannell* we believe a two year suspension to be too severe. On the other hand, because the client in this case was not an

astute, knowledgeable businessman, as in *Montgomery,* we believe more than a public reprimand is required.

The accused shall be suspended from the practice of law for a period of three months beginning with the effective date of this decision. *See* Oregon Rules of Appellate Procedure, 11.03(4). We also advise the accused to take the necessary steps to notify his clients and opposing counsel in any pending matter of his suspension and to refrain from any actions that may give the appearance that the accused is not complying with this order of suspension. *See In re Kraus,* 295 Or 743, 670 P2d 1012 (1983).

The Oregon State Bar is awarded its actual and necessary costs and disbursements. ORS 9.535(4).