Argued and submitted March 6, accused suspended from practice of law for period of one year, commencing 60 days from date of filing of decision October 9, 2008, reconsideration allowed by opinion January 29, 2009
See 345 Or 652, 202 P3d 165 (2009)

## In re Complaint as to the Conduct of

## RONALD D. SCHENCK,
*Accused.*

## (OSB 05-127, 05-128; SC S054585)

194 P3d 804

Ronald D. Schenck, Wallowa, argued the cause and filed the briefs *in propria persona*.

Mary Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

The Oregon State Bar (Bar) charged Ronald D. Schenck (the accused) with violating Code of Professional Responsibility Disciplinary Rules (DR) 1-102(A)(3) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 5-101(A)(1) (prohibiting conflict of lawyer's self-interest); DR 5-101(B) (barring preparation of instrument giving lawyer or person related to lawyer any substantial gift from unrelated client); DR 5-104(A) (limiting business relations with client); DR 5-105(E) (prohibiting multiple current client conflict of interest); and Oregon Rules of Professional Conduct (RPC) 8.1(a)(2) (requiring response to lawful demand for information from disciplinary authority).[1]

A trial panel of the Disciplinary Board determined that the accused's conduct violated DR 5-101(A)(1), DR 5-101(B), DR 5-104(A), DR 5-105(E), and RPC 8.1(a)(2), but not DR1-102(A)(3). The trial panel suspended the accused from the practice of law for one year. The accused sought review by this court. ORS 9.536(2); Bar Rule of Procedure (BR) 10.1. We review *de novo*. ORS 9.536(3); BR 10.6.

On review, the accused asserts that the Bar did not present sufficient evidence to prove that his conduct violated the disciplinary rules as charged.[2] For the reasons discussed below, however, we disagree. The record establishes, by clear and convincing evidence, that the accused violated the rules identified by the trial panel. We also agree with the trial

---

[1] The Oregon Rules of Professional Conduct became effective January 1, 2005, and replaced the Code of Professional Responsibility. The charges relating to the accused's representation of and conflict of interest with his client occurred before that date. Therefore, the Disciplinary Rules that were part of the Code of Professional Responsibility apply to those charges. However, because the Bar's investigation and the subsequent Bar proceeding occurred after January 1, 2005, the Rules of Professional Conduct apply to the charge that the accused failed to cooperate with the Bar's investigation.

[2] The accused also raises a facial challenge as to the constitutionality of two terms used to define lawyer conduct that would subject a lawyer to discipline. According to the accused, the terms "substantial gift" found in DR 5-101(B) and "lawful demand" found in RPC 8.1(a)(2) are unconstitutionally vague and give the Bar arbitrary and unlimited discretion to pursue disciplinary cases in violation of the state and federal constitutions. The accused's facial challenge to the constitutionality of the terms "substantial gift" and "lawful demand" are without merit, and we do not discuss them further.

panel's conclusion that the accused should be suspended for one year.

## I. FACTS

### A. *The Holec Matters*

The accused was admitted to the Oregon Bar in 1979 and established a private practice in Wallowa, Oregon. Shortly after moving to Oregon, the accused and his wife were introduced socially to the Holec sisters, Stephanie and Rose. At that time, both sisters were in their sixties, were unmarried, and shared a home. Soon after meeting the accused, Stephanie hired him to represent her in a legal matter involving real property. The accused also drafted a will for Stephanie in December 1982.

Fifteen years later, in January 1997, the accused approached Stephanie—then almost 80 years old—for a loan to remodel the home that he and his wife owned. Stephanie agreed and loaned the accused and his wife $15,000 at 10 percent interest, secured by a trust deed on their home. Four months later, in May 1997, the accused refinanced the home and paid Stephanie a part of the debt that he owed her; he did not, however, pay the loan in full. Instead of satisfying the note as originally contemplated, the accused paid Stephanie $6,700[3] in cash and signed a new note at 10 percent interest for $10,000, the principal balance due. That renegotiated note was unsecured. The record does not establish the maturity date of the unsecured note.

Over the next six years, the accused made sporadic payments on the unsecured note. Either shortly before or on May 16, 2003, the accused discussed his debt with Stephanie. At the time of that discussion, the note was either past due or soon to become due, and the balance on the note was $8,500. The accused and Stephanie—by then at least 85 years old—entered into another agreement to renew the loan. That agreement was again memorialized by an unsecured note,

---

[3] The cash payment of $6,700 represented a $5,000 principal payment and a $1,700 interest payment. Simple interest at 10 percent on a $15,000 balance for four months would have resulted in $500 interest. Thus, the $1,700 interest payment reflected an interest rate higher than the parties had agreed to in the original loan.

this time in a principal amount of $8,500, signed by the accused and his wife. That new note, dated May 16, 2003, stated a modified interest rate of eight percent, and extended the maturity date to May 1, 2005.[4]

On May 16, 2003—the same date as the date on the renegotiated note—the accused discussed a legal matter with Stephanie. Specifically, she asked the accused to collect a debt for her and her sister Rose. The accused's handwritten notes, also dated May 16, 2003, document that meeting. Those notes set forth the address and phone number for a person named "French" and reflect calculations that show an amount due of $12,606.30.

Three days later, on May 19, 2003, the accused mailed a letter to David and Fairy French (the Frenches), on behalf of Stephanie and Rose Holec (the sisters), demanding that the Frenches repay the sisters $12,606.30. That letter was prepared on stationary with "Ronald D. Schenck, Attorney at Law" letterhead. It stated that the accused "represent[ed] Stephanie and Rose Holec." It further stated that, if the Frenches did not pay the amount owed, in full, by June 1, 2003, "suit [would] be filed to obtain a judgment."

The Frenches responded directly to the accused. They asked the accused to remind the sisters that the sisters had told the Frenches earlier not to worry about the money because the sisters were counting on the accused to repay his $10,000 debt to them. The accused thereafter advised the sisters to accept a new note from the Frenches for the remaining balance at an annual rate of five percent interest and to secure that debt with a trust deed on property owned by the Frenches. The accused "strongly recommend[ed]" that, if the Frenches refused those terms, then the sisters should authorize him to file an action against them. Ultimately, the Frenches and the sisters agreed to a new note in the amount of $8,736 at six percent interest, secured by a trust deed on the Frenches' home.

---

[4] As we discuss later, the accused and the Bar dispute whether the note was renegotiated during the same meeting in which Stephanie sought the accused's legal help in collecting a debt. The accused maintains that he renegotiated the note during a meeting with Stephanie on an earlier date, despite the date of the note itself. Our analysis does not require resolution of that factual dispute.

In addition to advising the sisters in collecting the Frenches' debt, the accused drafted wills for each sister in April 2003. At that time, while the sisters were living together, Stephanie contacted the accused about a disagreement that she had had with Rose over their wills, which, according to Stephanie, left their respective estates to each other. Stephanie had decided that she no longer wanted Rose to receive her estate at her death. Stephanie asked the accused to draft a will that "cut Rose out." The accused considered Stephanie's request to cut Rose out of her will "stupid," and he knew that she would change her mind. Therefore, the accused drafted wills for both sisters leaving their respective estates to each other. The accused did so even though leaving Stephanie's estate to Rose was contrary to Stephanie's stated desire and even though, as he admitted, he "never talked to or communicated with Rose about her estate or any other legal matter." Rather, he prepared Rose's will based only on his discussions with Stephanie, who was a substantial beneficiary under its terms.

The accused delivered those wills to the sisters along with a cover letter addressed to them both. On "Ronald D. Schenck, Attorney at Law" letterhead, the accused wrote:

"Dear Stephanie and Rose,

"Here is a draft of a proposed Will [for] each of you for your consideration.

"You can write a note or a memo and set forth what personal property you want to leave to Pat [the accused's wife] or anyone else. You can give them a copy.

"I am sending a similar draft for Rose in hopes you two can discuss the problem and use this suggested method to resolve it. Rose, Stephanie did not ask me to do this draft for you. It is my idea after becoming aware of the disagreement you are having.

"Let's talk about it.

"We can put the home in Stephanie's name and Rose's CD's [*sic*] or whatever in her name and they will pass through these Wills as you both wish.

"Sincerely,

"RONALD D. SCHENCK"

Stephanie's draft will, enclosed with the cover letter, contained several blank spaces. The accused had inserted the blank spaces because "Stephanie never told [him] who she wanted to get her estate, only where she did not want it to go - to the hated niece." The accused left those spaces blank so that, among other things, Stephanie could fill in the recipient of the residual of her estate, if Rose should predecease her.

Rose's will did not have similar blank spaces, but instead provided that, should Stephanie predecease Rose, Rose's residual estate would be given to Rose's niece, Ramona Lode, whom Stephanie had told the accused she hated. The accused explained that he wrote that disposition into Rose's will, instead of leaving blanks, because that was "exactly the disposition [the a]ccused understood from Stephanie that Rose wanted." According to the accused, his intent in preparing the wills as he did was to "mediate the dispute" between the sisters. That is, he was suggesting a "legal vehicle" that would accomplish Rose and Stephanie's desires as he understood them to be.

As a part of that "legal vehicle," the accused drafted a provision that would create a reciprocal family trust on the death of one sister and the survival of the other. The residual estate of the deceased sister would flow to "The Holec Family Trust" for the benefit of the surviving sister. In other words, as long as the sisters did not die at the same time, "The Holec Family Trust" would have been created under the wills prepared by the accused. Both wills named the accused as trustee of the trust, if it came into existence. As trustee, the accused would have had the responsibility to distribute the income and principal of the trust as the accused "deem[ed] advisable" for the support of the surviving sister. The distributions would have been made "in such proportions, amounts, and intervals, as the Trustee determin[ed]." On the death of the beneficiary of the trust—*i.e.*, the surviving sister—the trust would terminate, and all remaining assets of the trust would be distributed "free and clear."

Under Rose's will, if Stephanie was the surviving sister and the "The Holec Family Trust" was created for her benefit, then the remaining assets of the trust, at her death, were to be distributed to Lode "free and clear." Under

Stephanie's will, if Rose was the surviving sister and the "The Holec Family Trust" was created for her benefit, the remaining assets of the trust, at her death, were to be distributed to whomever Stephanie designated. Stephanie's will had two blank spaces that pertained to the "Gift of Residue" distribution on her death: (1) a space for the recipient of Stephanie's residual estate, should Rose predecease her; and (2) a space for the recipient of the remaining assets of "The Holec Family Trust" on Rose's death, should Stephanie predecease Rose.

Around late September or early October 2003, Stephanie and Rose had a serious falling out, and Rose moved out of their shared home. Sometime later, the two sisters divided the debts that were owed to them. Rose took the debt owed by the Frenches; Stephanie took other debts, including the debt owed by the accused and his wife.

The accused asserts that, in October 2003, Stephanie "unilateral[ly] release[d the] accused of his obligation to her under the renewal note of May [16], 2003."[5] No satisfaction of that note was documented in the record. The accused stated that, despite Stephanie's "unilateral" decision to declare the debt satisfied, he "expected to pay the loan off before [she] passed on." Nonetheless, the accused did not make any further payments to Stephanie after October 2003. Stephanie's friend, Margi Wyatt, testified that the debt had not been satisfied and that Stephanie relied on payments from the accused, and others, to "live off of."

In November 2003, Stephanie again consulted the accused on a legal matter. Stephanie asked the accused to prepare the documents for the sale of her home to Harry Beckenhauer, and the accused did so. The record is unclear whether the transaction was completed using those documents, because the majority of the documents that the accused prepared are unsigned.

In July 2004, Stephanie again contacted the accused to prepare a will for her. In her initial telephone call to the

---

[5] The accused asserts that Stephanie told the accused that his note had been satisfied in October 2003, at a time when he was not representing Stephanie in any matter.

accused, Stephanie informed him of several developments: that she was unhappy with Beckenhauer; that she wanted a new will; that she was arguing with Rose about money and to whom they were going to leave their estate; and that she was having trouble collecting from the people who owed her money. Shortly after that conversation, the accused met with Stephanie in her home and quickly concluded that she had significant problems with her "mental ability." Nevertheless, the accused proceeded to discuss with Stephanie the revision of her will. In that discussion, according to the accused, Stephanie said that she wanted to leave her antiques and furniture and one half of the residue of her estate to the accused's wife, Pat. The accused indicated to Stephanie that he would prepare the will, including those gifts to his wife, but insisted "that we go to your doctor, Dr. Boyd, and have him write a letter as to whether or not you're now presently competent to make a will, to know what you're doing, and I want it witnessed by two witnesses, and notarized as far as the witnesses [are] concerned."

The accused thereafter prepared a will for Stephanie that included a gift of antiques and furniture and one half of the residue of Stephanie's estate to his wife, Pat. The other half of the residue was to go to Rose. However, according to the will's terms, if Rose were to predecease Stephanie, the entire residue would go to the accused's wife.

Stephanie was hospitalized shortly after the July 2004 meeting, as well as on several other occasions in fall 2004. When she returned home from the hospital after one of those occasions, the accused visited her and presented the new will.

Testimony at the hearing established that the antiques and furniture bequeathed to the accused's wife, under the terms of the new will, were worth at least $1,000, which the accused does not dispute. When questioned whether the gifts to his wife were "substantial," the accused testified that Stephanie had no substantial assets at the time that he prepared the will. The accused also testified that Stephanie had substantial assets at the time that she had told him that his loan was forgiven, just 10 months earlier.

The accused explained that seeming contradiction by assert-ing that Stephanie's financial condition had deteriorated quickly, over a course of only a few months. Nonetheless, the accused acknowledged that, under the will that he had pre-pared, in addition to the gift of antiques and furniture worth at least $1,000, his wife would receive the entire residue of Stephanie's estate if Rose were to predecease his wife.[6]

## B. *Response to the Bar's Inquiry into the Holec Matters*

The Bar received a complaint from the Wallowa County District Attorney concerning the accused's conduct regarding the Holec sisters. The Bar notified the accused of that complaint, by letter, and asked the accused to respond to the allegations. The accused did so. The accused's response, however, raised additional concerns relating to the accused's representation of the sisters. Accordingly, the Bar sent a let-ter to the accused requesting additional information.

In that letter, the Bar requested that the accused respond to three specific concerns: (1) the circumstances of the 1997 loan and its terms, and whether that loan had been repaid; (2) the circumstances of the May 2003 note, its rela-tion to the 1997 loan, and its execution in conformance with full disclosure as required by DR 10-101(B), and whether that loan had been repaid; and (3) the legal authority for the accused's assertion that he was required to comply with DR 10-101(B) only when Stephanie "moved forward with the exe-cution of the will" and not when he prepared the will that left a testamentary gift to his wife.[7]

---

[6] The record is not clear as to the potential value of the residue of Stephanie's estate at the time that the accused prepared Stephanie's will. Stephanie's estate may have included the debt owed by the accused in the amount of approximately $8,500, other debts supported by promissory notes payable to Stephanie, and any-thing that she might inherit or accumulate up until her death, including Rose's residual estate if Rose were to predecease Stephanie. Testimony at the hearing established the possibility of other unpaid debts due Stephanie from debtors besides the accused. The accused also asserted in his reply brief that Stephanie "loaned money, in significant amounts, to a number of different people over the years."

[7] In its letter, the Bar implied that a lawyer may prepare a will that gives the lawyer or a person related to the lawyer a substantial gift, if the lawyer obtains the client's full disclosure under DR 10-101(B). That suggestion misapprehends what the rule requires. DR 5-101(B) provides:

"A lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer as parent, child, sibling, or spouse any substantial gift

The accused refused to provide the information that the Bar requested regarding his debt to Stephanie. He asserted that the Bar lacked jurisdiction because "this loan did not involve [his] law practice in any manner[.]" That was so, the accused maintained, because Stephanie was not a client at the time of the loan.

The accused did provide a response to the Bar's request regarding the preparation of the will containing a gift to his wife. That response, however, was limited. The accused essentially restated that, according to his understanding of the rule, full disclosure and consent was not required before preparing and presenting the will to Stephanie.

The Bar wrote yet a third letter to the accused to obtain information and documents regarding the accused's debt to Stephanie. Specifically, the Bar explained its authority to inquire and reasserted its request that the accused explain his debt transactions with Stephanie. The accused wrote the Bar stating that he would provide nothing further on the complaint against him. In that same letter, he added that the Bar's investigation into the complaint was "turning into pure harassment." One week later, "in calmer reflection," the accused responded further. The accused acknowledged that he "gave Stephanie legal advice, pro bono, re[garding] the [Frenches'] collection, her will, and the sale of her house in 2003." However, he did not respond to the specific questions posed by the Bar, *i.e.*, the circumstances of and relationship between the 1997 and 2003 loans.

The Bar filed a formal complaint against the accused in December 2005. In his response to that complaint, the accused provided his first substantive explanation of the debt that he and his wife owed to Stephanie. Specifically, the accused explained that the new note was a renewal note for the balance remaining on the original note from 1997. He emphasized that it was not a "new" loan because Stephanie did not advance any money to the accused in May 2003. He

from a client, including a testamentary gift, except where the client is related to the donee."

The rule, by its terms, does not permit such an instrument to be prepared simply because the lawyer makes a full disclosure. The only exception to the prohibition stated in the rule is for a client who is related to the donee.

represented that Stephanie was "happy with the loan and [that] the interest she was receiving [ ] was generous under the economic circumstances at the time." The accused asserted that DR 5-101(A) and DR 5-104(A) could not apply to "renewal notes" because, if they did, the rules were unconstitutionally vague and failed to give notice sufficient to satisfy the state and federal constitutions. Additionally, the accused testified at the hearing that he had been unwilling to provide the Bar with information about the debt to Stephanie out of pure "Dutch stubbornness." Finally, he also testified that he had documents relating to multiple renewal notes between 1997 and 2003, but chose not to provide them to the Bar.

## II. DISCUSSION

### A. *Violation of DR 5-101(A)(1)*

The Bar alleges that the accused violated DR 5-101(A) when he undertook to assist Stephanie in collecting the Frenches' debt while contemporaneously renegotiating his own debt with Stephanie. DR 5-101(A)(1) provided, in part, that, except with the consent of the lawyer's client after full disclosure,

> "a lawyer shall not accept or continue employment if the exercise of the lawyer's professional judgment on behalf of the lawyer's client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests."

"Full disclosure" was defined in DR 10-101(B), which provided, in part:

> "(1) 'Full disclosure' means an explanation sufficient to apprise the recipient of the potential adverse impact on the recipient, of the matter to which the recipient is asked to consent.

> "(2) As used in DR 5-101, DR 5-104, DR 5-105 * * *, 'full disclosure' shall also include a recommendation that the recipient seek independent legal advice to determine if consent should be given and shall be contemporaneously confirmed in writing."

The accused does not dispute that he and Stephanie entered into a new loan agreement, dated May 16, 2003, for

the debt that he owed to her. Neither does the accused dispute that he met with Stephanie on that day to discuss the collection of the Frenches' debt. The accused does dispute, however, that Stephanie was his client at that time, for essentially two reasons. First, he relies on the facts that his conversations with Stephanie took place in his, or her, living room, not in his office, and that he did not bill Stephanie for his time. Second, he explains that the execution of the new note regarding his debt preceded his conversation with Stephanie as to the Frenches' debt collection matter, and, therefore, the lawyer-client relationship had not yet begun.

Neither argument has merit. The accused sent collection letters to the Frenches on his professional letterhead and threatened legal action if the debt was not paid. According to his demand letters, the accused "represented" both Stephanie and Rose. In doing so, the accused provided legal services to Stephanie. The fact that the accused may have discussed the Frenches' matter with her in a living room, instead of in his office, and the fact that he did not bill her for his time, are inconsequential to that conclusion.

■■ Neither does it matter if, as the accused asserts, he had resolved his debt with Stephanie before they began to discuss the Frenches' debt. "The relationship between lawyer and client is one of trust and confidence[,]" and does not abruptly start and stop—at least not necessarily—with the opening and closing of case matters. *In re Drake*, 292 Or 704, 713, 642 P2d 296 (1982). *Drake* illustrates that principle in application. There, the accused lawyer, Drake, borrowed money from his client, Gallagher. Drake had handled legal matters for Gallagher over a 10-year period and asserted that they had become friends. Drake had concluded a case matter with Gallagher in May 1976 and later solicited and obtained a loan from Gallagher in June 1976. *Id.* at 711. That solicitation took place while Gallagher was in Drake's office, "checking on some business." *Id.* at 708. Drake asserted that Gallagher was not a client at that time. Later, in August 1976, Drake assisted Gallagher in another legal matter. *Id.* at 709. Despite the fact that the loan was made between May and August, at a time when Drake did not have an open case with Gallagher, this court concluded that Gallagher was Drake's client at the time of the loan transaction in June. *Id.*

at 711. The court reasoned that, if the "simple termination of a case creates an opportunity or period in which an attorney is freed from the rules governing attorney-client relationships[,]" then, during that period, "the attorney would be free to use the rapport and confidence he had developed with his former client to persuade the former client to do things that would otherwise be prohibited by [the rules]." *Id.* at 713 (internal citations omitted).

Likewise, here, Stephanie was a client of the accused before May 16, 2003, when he and Stephanie executed the new loan note. In April 2003, Stephanie had asked the accused to redraft her will and her sister's will. The accused, in response to Stephanie's request, drafted wills for both sisters and, according to the date of his cover letter, delivered them on April 8, 2003. Sometime in May, Stephanie contacted the accused to discuss yet another legal matter—the Frenches' debt—and, according to the accused's handwritten notes, they discussed that matter on May 16, 2003. The accused asserts that he renegotiated his own personal debt with Stephanie at some point during that 37-day period, at which time he was not advising Stephanie on any legal matter. Under this court's reasoning in *Drake*, however, that break in his legal activities on Stephanie's behalf did not create a period in which the accused was free from the rules governing attorney-client relationships. *Id.* We therefore conclude that Stephanie was a client of the accused when the May 16, 2003, note was executed.

■ Whether the accused violated DR 5-101(A)(1), therefore, turns on whether his personal financial interest did or "reasonably may have affected" his professional judgment with regard to collecting the debts that were due to Stephanie. The Bar argues that the accused's professional judgment was affected by his status as Stephanie's debtor. More specifically, it argues that "[a] disinterested lawyer in the position of advising Stephanie and Rose about collecting unpaid debts likely would have addressed the [a]ccused's debt." The Bar urges that the accused did not advise his clients about collecting from him, but, instead, encouraged them to proceed against the Frenches. According to the Bar, the ultimate resolution of the two debts—*i.e.*, both the Frenches and the accused received reduced interest rates and

extended loan terms, but only the Frenches were required to secure their debt with a trust deed—provides clear and convincing evidence that the accused's professional judgment was, in fact, affected. We agree with the Bar's arguments that the accused's personal financial interest reasonably may have affected his professional judgment. The accused therefore was required to obtain Stephanie's written consent to representation under DR 10-101(B), which included recommending to Stephanie that she seek independent legal advice in that regard. He did not do so. The accused violated DR 5-101(A)(1).

## B. *Violation of DR 5-104(A)*

We turn next to the Bar's allegation that the accused violated DR 5-104(A) when he entered into a loan agreement with Stephanie on May 16, 2003, without first obtaining her consent in writing. DR 5-104(A) provided:

> "A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise the lawyer's professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

Again, full disclosure was defined in DR 10-101(B).

As already discussed, Stephanie was a client when she and the accused entered into the new loan agreement. The accused's and Stephanie's interests in that transaction differed—the accused was a debtor, and Stephanie was the person to whom he owed the debt. The accused asserts that his status as Stephanie's debtor is insufficient to prove a violation of DR 5-104(A). Rather, he argues, the Bar must prove that Stephanie expected the accused to exercise his professional judgment for her protection. In that regard, the accused urges that Stephanie—at age 85—did not expect him to exercise his professional judgment for her protection. The accused contends that Stephanie acted decisively, "dictating" the reduced interest rate, and that she had a history of ignoring much of the legal advice that he provided. Therefore, she did not expect him to protect her interests when she entered into the new loan agreement with him on May 16, 2003. The accused also contends that, had he attempted to persuade

Stephanie to seek advice from independent counsel with regard to that transaction, his attempt would have been futile. Therefore, he asserts, Stephanie did not expect the accused to exercise his professional judgment for her protection.

■ We disagree that the Bar must prove that Stephanie had that expectation. In *In re Montgomery*, 292 Or 796, 804, 643 P2d 338 (1982), this court wrote:

> "[W]hen a lawyer seeks to borrow money from a non-lawyer client who is not the in business of lending money, the lawyer must assume, in the absence of contrary expression by the client, that the client is relying on the lawyer for professional judgment to the same extent that the client would rely on the lawyer for advice had the client consulted the lawyer concerning such a loan to a third person."

(Internal citations omitted.) In the absence of evidence that Stephanie did not rely on the accused in his professional capacity, she is deemed to have done so.

At most, the evidence on which the accused relies is that Stephanie was a strong-willed 85 year old, with a mind of her own. Her character in that regard does not provide evidence of the needed "contrary expression" that she was not relying on the accused for his professional judgment. That is especially true in this context, where Stephanie had consulted with the accused and relied on his professional judgment in her financial dealings with others, such as the Frenches. The accused has not persuaded us, on *de novo* review, that he has overcome the presumption that Stephanie relied on his professional judgment in negotiating and renegotiating her loans to him. Therefore, before the accused entered into that business transaction with Stephanie—*i.e.*, the new note that included new terms that reduced his interest rate and extended his due date—he was required to obtain her consent in writing after "full disclosure," which had to include a recommendation that she seek independent legal advice. DR 10-101(B)(2). The accused did not do so. We conclude that the accused violated DR 5-104(A).

## C. *Violation of DR 5-105(E)*

Next we consider the alleged violation of DR 5-105(E), which provided:

> "Except as provided in DR 5-105(F), a lawyer shall not represent multiple current clients in any matters when such representation would result in actual or likely conflict."

The exception in DR 5-105(F) provided:

> "A lawyer may represent multiple current clients in instances otherwise prohibited by DR 5-105(E) when such representation would not result in an actual conflict and when each client consents to the multiple representation after full disclosure."

Again, full disclosure was defined in DR 10-101(B).

■ As noted above, the accused prepared wills for both Stephanie and Rose, knowing that they had an *actual* conflict as to how they would each dispose of their estates, which the accused does not deny. Nevertheless, the accused contends that he drafted the wills as a "friend" and that drafting wills, in general, does not require legal expertise; it follows, in the accused's view, that he was not required to comply with the rule. That argument is wholly without merit. The accused violated DR 5-105(E) when he prepared wills for both Stephanie and Rose, knowing that the sisters had an actual conflict.

## D. *Violation of DR 5-101(B)*

■ We next consider the alleged violation of DR 5-101(B), which provided:

> "A lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer as parent, child, sibling, or spouse any substantial gift from a client, including a testamentary gift, except where the client is related to the donee."

The Bar alleged that the accused violated that rule by preparing a will for Stephanie that included a gift of "antiques and furniture" to his wife and that provided that his wife would receive one-half of Stephanie's residual estate. The will also provided that, if Rose predeceased the accused's

wife, his wife would receive the entire residue of Stephanie's estate. The accused asserts that the gift to his wife was not "substantial" because the value of the antiques and furniture was only $1,000 or so, and because Stephanie's estate was otherwise valueless. We conclude that, regardless of the potential value of Stephanie's estate, the gift of $1,000 was a substantial gift within the meaning of rule. Accordingly, we conclude that the accused violated DR 5-101(B) by preparing a will for his client, Stephanie, that included a substantial gift to his wife.

E. *Violation of RPC 8.1(a)(2)*

The Bar alleges that the accused violated RPC 8.1(a)(2) when he failed to respond to the Bar's request for information regarding the debt that he owed to Stephanie. RPC 8.1(a)(2) provides, in part, that a lawyer, in connection with a disciplinary matter, shall not "knowingly fail to respond to a lawful demand for information from a[ ] * * * disciplinary authority[.]"

The accused asserts that the Bar did not make a "lawful demand" for the information because Stephanie was his friend, and not his client, when the debt originated in 1997, and, therefore, he did not violate the rule. The lawfulness of the Bar's request for information does not depend on the Bar being correct that there was a violation (which it was in this case). The Bar has authority to investigate when it has been presented with factual allegations that raise "an arguable complaint of misconduct." *See* ORS 9.542 (Board of Governors of the Bar authorized, subject to Supreme Court approval, to adopt rules governing investigations of conduct of attorneys); BR 2.5(b)(1) (if written complaint against attorney raises an "arguable complaint of misconduct," disciplinary counsel may require attorney to respond). We conclude that the accused violated RPC 8.1(a)(2) by refusing the Bar's demand for information about his debt to Stephanie.

## III. SANCTION

Having concluded that the accused violated DR 5-101(A)(1), DR 5-101(B), DR 5-104(A), DR 5-105(E), and RPC 8.1(a)(2), we must now, consistently with this court's well-established methodology, determine the appropriate

sanction. *In re Kluge*, 335 Or 326, 348, 66 P3d 492 (2003) (setting out methodology). In deciding the appropriate sanction, we are guided by the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards). *In re Sousa*, 323 Or 137, 145, 915 P2d 408 (1996). We are also guided by the recognition that the purpose of a sanction is not to penalize the accused, but is, rather, to protect the public and the integrity of the legal profession. *In re Glass*, 308 Or 297, 304, 779 P2d 612 (1989).

The trial panel imposed a one-year suspension. That sanction was based on the trial panel's findings that (1) the accused violated ABA Standards 4.3 (failure to avoid conflicts of interest) and 7.0 (violation of duties owed to the profession); (2) the accused acted knowingly or intentionally with regard to the violations concerning the sisters, and intentionally with regard to his refusal to provide the Bar with information about the debt to Stephanie; (3) the accused caused actual or potential harm to Stephanie and Rose, and caused actual harm to the legal profession and the public when he delayed the investigation and the resolution of the complaint against him; (4) no mitigating circumstances applied, but many aggravating circumstances existed to qualitatively and quantitatively increase the sanction—*i.e.*, a substantial record of prior discipline, a dishonest or selfish motive, a pattern of misconduct, multiple offenses, refusal to acknowledge wrongful nature of conduct, vulnerability of the accused's clients, substantial experience in the practice of law, and the accused's bad faith obstruction of the investigation and the formal proceedings; and (5) Oregon case law indicates that a lengthy suspension is warranted for the accused's conduct.

The accused disagrees with the trial panel's sanction as to its findings with regard to his mental state, the injury to the Holec sisters, and two of the aggravating factors—vulnerability of the victims and his prior disciplinary record. The crux of the accused's argument regarding his mental state is that, if he did not subjectively know that he was violating the rules, the Bar cannot prove an intentional or knowing state of mind. For example, the accused argues that he did not consider Stephanie to be a client when he executed the loan note on May 16, 2003, and, therefore, the "[a]ccused did not enter into the renewal note in May 2003 * * * knowing Stephanie

was a 'client.' " Likewise, the accused argues that he "did not intentionally * * * prepare a will for Stephanie providing that [the a]ccused's wife would receive a 'substantial [gift' from] Stephanie's estate" because he did not know that the gift might be considered substantial. If we understand the accused's argument, it is that he knew that negotiating a loan with a client without full disclosure was prohibited, but that, in these circumstances, he did not understand that Stephanie was a client. Likewise, the accused seems to argue that he knew that writing a client's will to include a substantial gift to his wife was prohibited, but that he was not aware that Stephanie, in this instance, was a client; neither was he aware that the gift to his wife was, in fact, "substantial" within the meaning of DR 5-101(B).

 We reject the accused's argument that, to be a knowing violation, an accused must be aware that his conduct violates a disciplinary rule. A violation is knowing if the accused acts with "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA Standards at 17. In other words, the accused must know the essential facts that give rise to the violation. Here, the accused was consciously aware of all essential facts on which his attorney-client relationship with Stephanie depended. The fact that he did not subjectively come to the conclusion that she was his client is beside the point. The same is true with regard to the substantiality of the gift to his wife that he wrote into Stephanie's will. The accused knew that his wife would receive Stephanie's antiques and furniture; he knew that they were valuable; and he did not dispute that they in fact were worth at least $1,000. He did not have to conclude subjectively that such a gift is "substantial" within the meaning of DR 5-101(B).

 With regard to the potential harm to the Holec sisters, the accused fails to understand that "an injury need not be actual, but only potential, in order to support the imposition of a sanction." *In re Williams*, 314 Or 530, 547, 840 P2d 1280 (1992). Potential injury is harm that was reasonably foreseeable at the time of the violation but that ultimately did not occur. ABA Standards at 17. The accused asserts that the preparation of the wills for both Rose and Stephanie did

not cause Rose any harm, actual or potential, because she was not "involved in any manner." Likewise, according to the accused, Stephanie did not suffer injury, because she did not execute that will. As to the will for Stephanie that included the gift to his wife, the accused asserts that no harm came to Stephanie because "she rejected it." He adds that, even if she had executed that will, a gift to his wife could not have harmed Stephanie because it would be delivered "after her death" and, therefore, could not affect Stephanie in any way.

Those arguments are not well taken. Preparation of the wills by the accused created a reasonably foreseeable injury to both Rose and Stephanie. The fact that they were delivered but never executed establishes that the injury was potential only, rather than actual. But potential injury, as this court explained in *Williams*, is sufficient to support a sanction. 314 Or at 547. The accused's arguments with regard to the improper application of aggravating factors— *i.e.*, the vulnerability of the victim and his disciplinary record—are meritless.

In determining the appropriate sanction, we take into consideration an accused's disciplinary record, which in this case is extensive. In 1991, the accused was reprimanded for violating DR 5-101(E) (prohibiting current client conflict of interest). *In re Schenck*, 5 DB Rptr 85 (1991). In 1994, the accused was reprimanded for violating DR 7-104(A)(1) (prohibiting communication with a represented party) and DR 7-110(B) (prohibiting *ex parte* contact with officials). *In re Schenck*, 320 Or 94, 879 P2d 863 (1994). In 2004, the accused was reprimanded for violating DR 7-101(A)(3) (intentionally prejudicing or damaging a client). *In re Schenck*, 18 DB Rptr 309 (2004). The existence of several prior disciplinary offenses is a consideration that justifies increasing the degree of discipline imposed. ABA Standard 9.22(a) (aggravating factor—prior disciplinary offenses); *see also In re Jones*, 326 Or 195, 200, 951 P2d 149 (1997) (setting out criteria for evaluating prior disciplinary offenses).

We also consider Oregon case law in determining whether a lengthy suspension is warranted. *Kluge*, 335 Or at 348. The trial panel imposed a suspension for a period of one year. In urging that a one-year suspension is in accord with

past cases, the Bar principally relies on, among other cases, *In re Altstatt*, 321 Or 324, 897 P2d 1164 (1995), and *In re Gildea*, 325 Or 281, 936 P2d 975 (1997).

In *Altstatt*, the accused borrowed money for several years from a client, Cummins. Shortly before Cummins's death, the loans were consolidated into a single note. After Cummins died, Altstatt, who had drafted Cummins's will, represented the personal representatives of Cummins's estate without disclosing the potential for his conflict of interest as a debtor to affect his professional judgment. In advising the personal representatives, Altstatt convinced them to let him forgo payment of his debt until the estate closed. Altstatt's conduct was found to have violated DR 5-101(A) (prohibiting conflict of lawyer's self-interest ). Altstatt, who also accepted payment of his fees without prior court approval in violation of DR 1-102(A)(4) (conduct prejudicial to the administration of justice) and DR 2-106(A) (collecting an illegal fee), was suspended for one year, despite his lack of prior disciplinary history. *See also In re Moore*, 299 Or 496, 508, 703 P2d 961 (1985) (one-year suspension for loan transactions in conjunction with multiple conflicts); *In re Boyer*, 295 Or 624, 669 P2d 326 (1983) (seven-month suspension for negotiating a loan transaction between two clients).

In *Gildea*, the accused, a long-time friend and legal counsel to an elderly woman, was found to have violated, among other rules, DR 5-101(A)(1) (prohibiting conflict of lawyer's self-interest) and DR 5-104(A) (limiting business relations with client). *Gildea*, 325 Or at 283. Gildea obtained a general power of attorney from his elderly client without advising her of a potential conflict and then used the power of attorney to assign himself a trust deed on the client's real property in order to ensure that income from that property could be used for the client's care at an assisted living facility. Although this court noted that Gildea had acted in good faith, and always in his client's best interest, it nevertheless imposed a lengthy suspension of 120 days. *Id.* at 300.

*Altstatt* and *Gildea* support a one-year suspension in this case. The accused's conduct is analogous to that involved in those cases. Unlike either of the accused lawyers in those cases, however, the accused has an extensive disciplinary

record. Also, the accused in this case refused to cooperate in the investigation, which resulted in a violation of RPC 8.1(a)(2) (requiring response to lawful demand for information from disciplinary authority). Such a violation, even in the absence of other substantive disciplinary violations, is a basis for a stiff sanction. *See In re Miles*, 324 Or 218, 223, 923 P2d 1219 (1996) (120-day suspension for failure to cooperate, noting that, "[i]n most cases, either a single, significant failure to cooperate with a disciplinary investigation or lesser, multiple failures to cooperate warrant a lengthy suspension from the practice of law"); *In re Schaffner*, 323 Or 472, 481, 918 P2d 803 (1996) (60 days of 120-day suspension attributed to failure to cooperate). The accused's refusal to cooperate in the investigation of this matter—out of "Dutch stubbornness" and after two written requests—is a strong aggravating factor that, under Oregon case law, also supports a lengthy suspension from the practice of law.

In sum, we conclude that the accused violated several disciplinary rules, which is a basis for a lengthy suspension. The seriousness of those violations are compounded in this case by the accused's mental state, his prior disciplinary record, and his refusal to cooperate in the investigation of the matter. We therefore agree with, and adopt, the sanction imposed by the trial panel. *See* BR 10.6 (court may adopt the decision of the trial panel, in whole or in part).

The accused is suspended from the practice of law for a period of one year, commencing 60 days from the date of filing of this decision.