No. 45 June 26, 2014 679

IN THE SUPREME COURT OF THE
STATE OF OREGON

In re Complaint as to the Conduct of
MICHAEL L. SPENCER,
*Accused.*
(OSB 11-52; SC S060977)

En Banc

On review of the decision of a trial panel of the Disciplinary Board.

Argued and submitted January 16, 2014.

Michael A. Spencer, Klamath Falls, argued the cause and filed the brief *in propria persona*.

Mary A. Cooper, Assistant Disciplinary Counsel, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

The accused is suspended from the practice of law for a period of 30 days, commencing 60 days from the filing of this decision.

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar charged the accused with violating two Rules of Professional Conduct (RPC): RPC 1.7(a), which prohibits a lawyer from representing a client without informed consent if "there is a significant risk that the representation *** will be materially limited by *** a personal interest of the lawyer"; and RPC 1.8(a), which prohibits a lawyer from "enter[ing] into a business transaction with a client" without the requisite advice and the client's consent. A trial panel of the Disciplinary Board found that the accused had violated both rules and imposed a 60-day suspension. On *de novo* review, we find that the accused violated RPC 1.8(a) and suspend him from the practice of law for 30 days.

## I. FACTS

The accused has been a member of the Bar since 1983 and a licensed real estate broker since 2003. In March 2008, a prospective client, Smith-Canfield, met with the accused to ask about filing for bankruptcy. Smith-Canfield told the accused that she anticipated receiving approximately $30,000 from the sale of real property in another state. At that point, Smith-Canfield was living in rental housing in Klamath Falls, and the accused advised her that she could take advantage of an exemption in the bankruptcy law if she used the proceeds from the out-of-state property sale to buy a home and then filed a Chapter 13 bankruptcy petition. To take advantage of that exemption, however, she needed to buy a home within one year of the sale of her other property.

When Smith-Canfield expressed concern that a bank would not loan her money to buy a home, the accused explained that he was a real estate broker and could look for an owner-financed property for her.[1] Having received that advice, Smith-Canfield agreed to have the accused represent her, and the accused began searching for a suitable property and also preparing the bankruptcy filing.

---

[1] The sales agreement that the accused later prepared stated that he was acting only as the buyer's (Smith-Canfield's) real estate agent.

The next month, the accused learned about a relatively new home that might fit Smith-Canfield's needs. The owner was in financial trouble, and the person who held the trust deed was willing to finance Smith-Canfield's purchase. The accused estimated the amount due on the trust deed and, based on that estimate, determined the lowest possible offer that the owner would be likely to accept. He advised Smith-Canfield to offer to pay $225,000 and to put $25,000 down. That offer was below both the market value and the listed price. Smith-Canfield accepted the accused's advice and asked him to prepare an offer to that effect. She was aware that, if the owner accepted her offer, the accused would split the sales commission with the owner's real estate agent.

Based on the accused's advice, Smith-Canfield made her offer contingent on three conditions. First, the owner had "to rebuild [a] retaining wall along Old Fort Rd."[2] Second, he had to "remove all junk from the house." Third, he had to "have the carpets cleaned. If the stains on the carpet do not clean out," then the owner had to give Smith-Canfield $1,000 to replace the existing carpets. Based on the accused's advice, Smith-Canfield did not impose any other conditions on the sale. As the accused later explained, the goal was to purchase the property quickly at the lowest possible price. Additionally, the accused advised Smith-Canfield to waive a professional inspection, even though the pre-printed offer stated that it was advisable to have one.[3] The accused concluded that, because the house was relatively new, a professional inspection was unlikely to be worth the cost, especially in light of Smith-Canfield's limited financial resources. Based on the accused's advice, Smith-Canfield waived a professional inspection.

The owner accepted Smith-Canfield's offer and took steps to satisfy the conditions she had listed. During the

---

[2] The back yard of the house sloped down to Old Fort Road. A three-foot high retaining wall ran along the base of the slope. The retaining wall consisted of masonry blocks stacked on top of each other. When the accused initially took Smith-Canfield to see the home, they noticed that approximately 25 percent of the blocks had fallen down.

[3] The offer states that "Buyer understands that it is advisable to have a complete inspection of the Property by qualified professional(s) relating to such matters as * * * soil condition/compaction/stability [and] zoning * * *."

final walk-through, the accused and Smith-Canfield noted that the masonry blocks that formed the retaining wall had been restacked and the carpets cleaned. The sale closed that month, and the accused received approximately $5,000 as his share of the real estate sales commission. The accused's commission came out of the proceeds that otherwise would have gone to the seller.

In May 2008, the accused filed Smith-Canfield's Chapter 13 bankruptcy petition. Shortly afterwards, Smith-Canfield received a letter from the City of Klamath Falls, stating that the dirt slope at the back of the yard violated the city code and that she needed either to "[r]estore the slope of [her] property to [city code] specifications * * * or provide an engineered plan for a retaining wall."[4] Smith-Canfield contacted the accused, who investigated the city's allegations. The accused wrote the seller and demanded that he bring either the slope or the retaining wall into compliance. The seller responded that, because he had limited financial resources, he could not be of any help. The accused also questioned whether the city had authority to require Smith-Canfield to restore the slope or provide an engineered retaining wall. Although the accused doubted the city's authority, he was concerned that Smith-Canfield did not have enough money to fund a legal dispute with the city. He believed that she could have the funds in a year's time, based on her Chapter 13 plan. Accordingly, he asked for and received a one-year extension from the city for Smith-Canfield to respond to the city's demand.

Several months later, Smith-Canfield mentioned her dispute with the city to another lawyer. That lawyer later contacted the accused, questioning his handling of both the real-estate purchase and the city's notice of a code violation. After receiving those communications, the accused

---

[4] The accused testified, and the Bar offered no contrary testimony, that a professional inspection would not have disclosed the city code violation. Additionally, the Bar offered no testimony that a reasonable real estate broker or lawyer would have been aware that the grade of the slope was too steep. Indeed, the accused testified, without dispute, that similar grades were common at nearby properties and that neither the county nor the state imposed a comparable grade requirement.

withdrew from representing Smith-Canfield. Represented by a new lawyer, Smith-Canfield brought an adversary action against the accused in the bankruptcy proceeding, alleging that he had breached his fiduciary obligation to disclose conflicts of interest and that he also had breached his professional duty regarding the purchase of her home. The bankruptcy court found, by a preponderance of the evidence, that the accused had breached both duties and that Smith-Canfield had suffered financial injury as a result.[5]

In early 2011, Smith-Canfield's employer in Klamath Falls went out of business, and Smith-Canfield lost her job. Later that year, she converted her bankruptcy proceeding from a Chapter 13 to a Chapter 7. Eventually, she gave up the home that she had bought, with the result that she lost her down payment and three years of payments on the home.

In July 2011, the Bar filed a complaint against the accused, alleging that he had violated RPC 1.7(a) and RPC 1.8(a). The trial panel found that the accused had violated both rules and determined that a 60-day suspension was the appropriate sanction. The accused petitioned for review in this court. We review the record *de novo* to determine whether the Bar established the alleged violations by clear and convincing evidence. *See* Bar Rule (BR) 10.6 (providing for *de novo* review); BR 5.2 (requiring proof by clear and convincing evidence).

## II.   RPC 1.8(a)

RPC 1.8(a) prohibits a lawyer from "enter[ing] into a business transaction with a client" or "knowingly acquir-[ing] *** [a] pecuniary interest adverse to a client" unless certain conditions are met.[6] A lawyer may enter into a business transaction with a client if, among other things,

---

[5] The accused assigns error to the trial panel's ruling admitting a copy of the bankruptcy court's decision and judgment because the bankruptcy court's findings were based on a preponderance of the evidence standard rather than the clear and convincing standard that applies in disciplinary proceedings. The chair of the trial panel stated that the panel did not give the bankruptcy court's decision preclusive effect, and neither do we. The trial panel did not err in admitting the decision and judgment.

[6] RPC 1.8(a) provides:

"A lawyer shall not enter into a business transaction with a client or knowingly acquire [a] *** pecuniary interest adverse to a client unless:

the terms of the transaction are fair, the client is advised in writing of the desirability of seeking independent legal advice, and the client consents in a signed writing to the transaction's essential terms and the role that the lawyer will play in the transaction. RPC 1.8(a)(1)-(3). In this case, the accused concedes that he did not obtain written consent from Smith-Canfield after giving her the requisite advice. The question under RPC 1.8(a) accordingly reduces to whether, in agreeing to act as Smith-Canfield's real estate broker, the accused either entered into a "business transaction" with her or "knowingly acquir[ed] a pecuniary interest adverse to" Smith-Canfield's interests.

This court has not previously construed RPC 1.8(a). The predecessor rule, *former* DR 5-104(A), required disclosure and consent regarding business transactions between lawyers and clients if their interests differed and if the client expected that the lawyer would exercise professional judgment on the client's behalf in the transaction. *See In re Samuels/Weiner*, 296 Or 224, 232-33, 674 P2d 1166 (1983) (business transactions with clients are not inherently unethical; instead, "[i]t is when the client and the lawyer have differing interests and the client expects the lawyer to exercise *** professional judgment for the protection of the client that [(*former*)] DR 5-104(A) comes into play"); *In re Bartlett*, 283 Or 487, 496-97, 584 P2d 296 (1978) (same).

On review, the parties frame the question under RPC 1.8(a) similarly; that is, they debate whether the accused's interests in this transaction either differed from or were adverse to Smith-Canfield's. We note, however, that the text of RPC 1.8(a) differs from the text of *former* DR 5-104(A). RPC 1.8(a) prohibits a lawyer from "enter[ing]

"(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

"(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

"(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction."

into a business transaction with a client" without first making certain disclosures and obtaining the client's written consent. It does not expressly require that the lawyer and the client's interests in the transaction differ. To be sure, RPC 1.8(a) also prohibits lawyers from "knowingly acquir-[ing] an ownership, possessory, security or other pecuniary interest adverse to a client." However, not only are the two prohibited acts separated by "or," but the second prohibited act—acquiring a pecuniary interest adverse to a client—is modified by the adverb "knowingly." The first prohibited act is not similarly limited. The text of the rule suggests that entering into a business transaction with a client is itself prohibited, unless the terms of the transaction are fair and reasonable to the client, the requisite disclosures are made, and the necessary consent obtained.

The history of the rule confirms that interpretation. For the purposes of this issue, RPC 1.8(a) tracks ABA Model Rule 1.8(a) verbatim. *See* Oregon Rules of Professional Conduct 8 (explaining that RPC 1.8(a) "replaces DR 5-104(A) and incorporates the Model Rule prohibition against business transactions with clients even with consent except where the transaction is 'fair and reasonable' to the client"). We accordingly look to the commentary to ABA Rule 1.8(a) for guidance in construing RPC 1.8(a). *See In re Hostetter*, 348 Or 574, 590, 238 P3d 13 (2010) (looking to the commentary to the model rule for its persuasive value when an Oregon rule is identical to the model rule). The commentary does not suggest that, for the "business transaction" prohibition to apply, the lawyer and client must have differing or adverse interests. Instead, the commentary explains that the rule recognizes "the possibility of overreaching when the lawyer participates in a business, property or financial transaction with a client" and disfavors an arrangement in which the lawyer has an "advantage in dealing with the client." American Bar Association's Model Rules of Professional Conduct (ABA Model Rules), Rule 1.8, comment [1] (2007). Additionally, in discussing the advice that a lawyer gives a client, the commentary recognizes that a lawyer's actions may violate ABA Rule 1.8(a) but not ABA Rule 1.7(a). *Id*.[7]

_____

[7] Specifically, the commentary to ABA Rule 1.8 states that, when a lawyer enters into business transactions with a client,

The commentary to ABA Rule 1.8(a) establishes that the first part of that rule serves as a general prophylactic against lawyers entering into business transactions with clients and does so regardless of whether the lawyer knowingly acquires a pecuniary interest adverse to his or her client, *see* RPC 1.8(a), or whether entering into the transaction creates a significant risk of materially limiting the lawyer's ability to represent his or her client, *see* RPC 1.7(a)(2). Given the identity between the text of RPC 1.8(a) and the text of the ABA rule on which it was modeled, we find the commentary to ABA Rule 1.8(a) persuasive in interpreting the meaning of Oregon's rule. Specifically, we conclude that the accused violated RPC 1.8(a) if he entered into a business transaction with Smith-Canfield without first providing the advice that that rule requires and obtaining the necessary consent.

The accused argues that, when he agreed to act as Smith-Canfield's real estate broker, he was not entering into a "business transaction" with her within the meaning of RPC 1.8(a). We reach a different conclusion. The commentary to ABA Rule 1.8 explains that that rule applies to transactions that are both unrelated and related to the subject of the legal representation. ABA Model Rules, Rule 1.8, comment [1]. Specifically, the commentary states that the rule "applies to lawyers engaged in the sale of goods or services related to the practice of law, for example, the sale of title insurance or investment services to existing clients of the lawyer's legal practice." *Id.* If, as the commentary states, the rule against entering into business transactions with a client applies to the sale of title insurance, it is difficult to see why it does not also apply to an agreement to serve as the client's real estate broker. That type of agency agreement is a common feature of the real estate business and is separate from the practice of law, even though, in this case,

"[t]he risk to a client is greatest when the client expects the lawyer to represent the client in the transaction itself or when the lawyer's financial interest otherwise poses a significant risk that the lawyer's representation of the client will be materially limited by the lawyer's financial interest in the transaction. [In that situation,] the lawyer's role requires that the lawyer must comply, not only with the [disclosure and consent] requirements of paragraph (a) [of ABA Rule 1.8], but also with the [disclosure and consent] requirements of [ABA] Rule 1.7."

ABA Model Rules, Rule 1.8, comment [3].

the agreement was ancillary to the accused's representation of Smith-Canfield in the bankruptcy proceeding.

The accused advances two contrary arguments. He argues initially that, when a lawyer agrees to represent a client, that agreement could be characterized as a "business transaction." He reasons, however, that no one would suggest that an agreement to provide legal services is a business transaction that is subject to RPC 1.8(a). In the accused's view, an agreement to serve as a real estate broker is no different from an agreement to serve as a lawyer. It follows, he concludes, that neither agreement should be viewed as a "business transaction" to which RPC 1.8(a) applies.

Even if an agreement to provide legal services could be characterized, in the abstract, as a "business transaction," the Oregon Rules of Professional Conduct regulate that transaction differently from other business transactions. For example, RPC 1.1 requires that a lawyer provide competent legal representation to his or her client. RPC 1.2 governs when a lawyer can limit the scope of legal representation. RPC 1.4 requires that a lawyer keep clients reasonably informed about certain matters regarding the legal representation. RPC 1.5 regulates the fees that a lawyer can charge a client for engaging in legal representation.

We need not detail all the Rules of Professional Conduct that regulate agreements to provide legal services to demonstrate that the Oregon Rules of Professional Conduct regulate that transaction differently from other business transactions. It follows, we conclude, that RPC 1.8(a) does not apply to agreements to provide legal services but it does apply to other business transactions.[8]

Were there doubt about the issue, the commentary to ABA Rule 1.8(a) removes it. The commentary explains that

---

[8] The commentary to ABA Rule 1.8(a) also notes that the rule does not apply "to standard commercial transactions between the lawyer and the client for products or services that the *client* generally markets to others, for example, banking or brokerage services, medical services, products manufactured or distributed by the client, and utilities' services." ABA Model Rules, Rule 1.8, comment [1]. That is, if the client generally markets services, such as banking services, to the public, Rule 1.8(a) does not prevent the lawyer from availing him- or herself of those services. In such transactions, the lawyer has no advantage in dealing with the client, rendering the prohibition "unnecessary and impractical." *Id.*

ABA Rule 1.8(a) "does not apply to ordinary fee agreements between client and lawyer, which are governed by [ABA] Rule 1.5." ABA Model Rules, Rule 1.8, comment [1]. ABA Rule 1.8, however, does apply to related business transactions, such as "the sale of title insurance" and, we conclude, to an agreement to serve as a client's real estate broker. Interpreted in the same way, RPC 1.8(a) protects clients from "the possibility of overreaching when the lawyer participates in a business, property or financial transaction with the client," such as serving as the client's real estate broker. *Id.* It also protects clients from (or puts them on notice of) the differing obligations that lawyers and brokers may have in real estate transactions. *See* California Formal Ethics Opinion 1982-69 (explaining that a real estate broker's obligation to disclose information can conflict with a lawyer's obligation to protect confidential client communications).

The accused advances a second argument. Starting from the premise that the phrase "business transaction" in RPC 1.8(a) does not include agreements to provide legal services, the accused reasons that his agreement with Smith-Canfield to serve as her real estate broker and to represent her in the Chapter 13 bankruptcy proceeding were "different parts of the same transaction." It follows, he contends, that both parts of that single transaction were exempt from RPC 1.8(a). We do not doubt that the accused's agreement to serve as Smith-Canfield's real estate broker was related to his agreement to represent her in the bankruptcy proceeding. As the commentary to the Model Rule notes, however, the fact that "a sale of goods or services" is "related to the practice of law" does not exclude it from being a business transaction within the meaning of ABA Rule 1.8(a) and, by extension, RPC 1.8(a). We agree with the Bar that the accused violated RPC 1.8(a).

### III.    RPC 1.7(a)

The Bar also alleged that the accused violated RPC 1.7(a). That rule provides that "a lawyer shall not represent a client if the representation involves a current conflict of interest," unless the lawyer reasonably believes, among other things, that he or she can provide competent and diligent representation and the client gives informed consent in writing, RPC 1.7(b)(1), (4). Because the accused did not

obtain the requisite consent, the issue reduces to whether his representation of Smith-Canfield "involve[d] a current conflict of interest." On that issue, RPC 1.7(a)(2) provides that a current conflict exists if "there is a significant risk that the representation of one or more clients will be materially limited by * * * a personal interest of the lawyer."

On review, the Bar advances two theories why that risk existed here. It argues initially that the accused's personal financial interest in obtaining a share of the real estate commission presented a "significant risk" of "materially limit[ing]" his legal representation of Smith-Canfield. Alternatively, the Bar argues that a current conflict arose when the City of Klamath Falls notified Smith-Canfield that she needed either to restore the slope behind her house or build an engineered retaining wall. The Bar contends that, at that point, the accused's "personal interest in avoiding or minimizing his own potential liability as lawyer and/or real estate broker for this purchase unavoidably inhibited his ability to advocate on Smith-Canfield's behalf."

Whatever the merits of the Bar's alternative theory, the Bar did not allege that theory in its complaint, and it is not properly before us. *See In re Chambers*, 292 Or 670, 676, 642 P2d 286 (1982); *In re Ainsworth*, 289 Or 479, 487, 614 P2d 1127 (1980). The Bar's claim under RPC 1.7(a) accordingly rests on its initial theory, which it did allege in its complaint, that "[a]t all relevant times there was a significant risk that the Accused's representation of Smith-Canfield would be materially limited by the Accused's personal interest in a sales commission."

As we understand the Bar's first theory, it runs as follows. Smith-Canfield reasonably understood that the accused would act as her lawyer in both the bankruptcy proceeding and the real estate transaction.[9] She thus looked to him for advice and guidance in protecting her from unnecessary legal risks in buying a home. The accused, however,

---

[9] Smith-Canfield testified that she understood that the accused was acting as her lawyer in both matters. On review, the accused does not dispute that point; indeed, he argues that the transactions were so integrally related that they were, in effect, one matter. Without a timely explanation to Smith-Canfield that he was acting as her lawyer only in the bankruptcy proceeding, and the accused provided none, we accept the premise of the Bar's argument.

had a financial interest in closing the real estate sale that was independent of, and adverse to, his obligation to protect Smith-Canfield's legal interests in the real estate transaction. Specifically, protecting Smith-Canfield's legal interests in the real estate transaction could have prevented the sale from closing and, as a result, could have precluded the accused from recovering a sales commission. In the Bar's view, the accused's conflict of interest is self-evident.

The accused responds that, even if his financial interest in recovering a real estate commission was potentially adverse to Smith-Canfield's, that interest did not pose a "significant risk" of "materially limiting" his representation. He notes that, as a real estate broker, he had a fiduciary duty to advance Smith-Canfield's interests. *See* ORS 696.810(3)(c) (imposing an affirmative duty on a buyer's real estate broker "[t]o be loyal to the buyer by not taking action that is adverse or detrimental to the buyer's interest in a transaction"). He argues that the prospect of receiving a commission if the real estate sale closed did not create a conflict of interest any more than the prospect of receiving a contingency fee creates a conflict of interest for a lawyer. Both prospects pose a risk that a lawyer or a real estate broker may put his or her own financial interest in receiving a fee ahead of the client's interests. The accused notes, however, that contingency fees are an accepted part of legal practice, and he concludes from that fact that the prospect of receiving a contingency fee (or a real estate commission) does not pose a "significant risk" of materially limiting a lawyer's representation of his or her client.

In our view, neither party identifies the exact interests that are at stake when a lawyer seeks to serve both as a client's legal advisor and real estate broker. Contrary to the Bar's argument, the accused's interest in obtaining a share of the sales commission is not necessarily adverse to Smith-Canfield's interests. She had an interest in closing the real estate deal so that she could shelter her assets from creditors in the bankruptcy proceeding. The accused had a parallel interest in closing the deal. Put differently, this is not a situation where the accused's financial interests were directly adverse to Smith-Canfield's. *Cf. Restatement (Third)*

*of the Law Governing Lawyers* § 125 comment c, illustrations 1 and 2 (2000) (explaining that a lawyer could not represent a client suing a business in which the lawyer or a close relative held a significant stake because the lawyer's and the client's interests would be directly adverse). Rather, the accused's interests were largely aligned with Smith-Canfield's.

Conversely, and contrary to the accused's argument, the accused's interest in acquiring a share of the sales commission is not identical to a lawyer's interest in recovering a contingency fee. A lawyer will recover a contingency fee only if the client succeeds in the matter on which the lawyer provides legal representation. In contrast, the accused's ability to recover a sales commission did not turn on whether he advanced Smith-Canfield's legal interests in the transaction. Indeed, an insistence on protecting Smith-Canfield's legal interests could have prevented a sale from closing that, from a broker's perspective, may have made business sense. Therein, we think, lies the problem in the accused's serving as both Smith-Canfield's broker and lawyer. In advancing his client's business interests as a broker, the accused may have discounted risks that, as a lawyer, he should counsel his client to avoid or at least be aware of.[10]

In our view, the accused's analogy between sales commissions and contingency fees fails to recognize that he may have different goals in seeking to advance his client's business interests as her broker and in seeking to advance her legal interests as her lawyer. In this case, however, the Bar has not alleged that those differing goals were the source of a current conflict under RPC 1.7(a)(2). We accordingly have no occasion to consider whether those differing goals would give rise to a current conflict. Rather, the Bar has alleged only that the prospect of recovering a share of the sales commission created a current conflict. On that narrow issue, we agree with the accused that ordinarily the prospect of receiving a commission or a contingency fee is not enough, standing alone, to create a "significant risk" of

---

[10] For example, the accused testified that he advised Smith-Canfield to limit the number of contingencies to keep the sale price low. While that may have been a reasonable business strategy as a broker, that strategy did not necessarily advance his client's legal interests to the extent it left her exposed to the sort of losses that occurred in this transaction.

materially limiting the lawyer's representation of his or her client. The risk that a lawyer will disserve his client's interest to obtain a real estate sales commission is no greater than the risk that a lawyer will disserve his client's interests to obtain a contingency fee.

In that respect, we note that RPC 1.5 imposes only limited restrictions on contingency fees. RPC 1.5(a) generally prohibits "illegal" and "clearly excessive fee[s]," and RPC 1.5(c) prohibits contingency fees in certain domestic relation cases and also in criminal cases. Beyond that, the Rules of Professional Conduct rely on other, more general rules to ensure that a lawyer does not place his or her own interests in receiving a fee ahead of the client's interests. *See, e.g.*, RPC 2.1 (providing that a lawyer "shall exercise independent professional judgment and render candid advice"). Those same, more general rules applied to the accused when he undertook to represent Smith-Canfield's legal interests in the real estate transaction.

To be sure, the prospect of receiving a contingency fee (or a real estate commission) poses a risk that a lawyer (or a lawyer acting as a client's broker) will put the lawyer's interests ahead of the client's. However, we cannot say that that prospect alone poses a "significant risk" that the lawyer will do so. *See* ABA Model Rules, Rule 1.7, comment [8] (explaining that "[t]he mere possibility of subsequent harm" does not constitute a significant risk; there must be a "likelihood that a difference in interests will eventuate"); *In re Tonkon*, 292 Or 660, 666, 642 P2d 660 (1982) (explaining that *former* DR 5-101(A) required, at a minimum, a "substantial risk" that the lawyer's personal interest would affect his or her advice). In this case, the Bar has based its claim that the accused violated RPC 1.7(a)(2) solely on the allegation that the prospect of receiving the commission posed a "significant risk" of materially limiting the accused's representation of Smith-Canfield. The Bar has not persuaded us that that fact alone is sufficient.[11]

---

[11] We do not foreclose the possibility that the evidence in a particular case may show that either the size of the commission or a lawyer's specific need for immediate funds created a significant risk of materially limiting the lawyer's representation. That is not this case, however. Similarly, we do not foreclose the possibility that additional aspects of the accused's dual roles as a broker and a lawyer may, either singly or in combination, give rise to a current conflict.

The Bar advances two contrary arguments. First, the Bar cites a 2006 Oregon State Bar ethics opinion as support for its position that the prospect of recovering a real estate commission will always create a conflict of interest for lawyers who serve as their clients' legal advisors and brokers in real estate transactions. The Bar notes that "Oregon's analysis of this issue is not unique" and cites ethics opinions from three other jurisdictions, California, New York, and Kentucky. In our view, those opinions provide less support than the Bar perceives.

We begin with the Bar's 2006 ethics opinion. The question that opinion addressed was whether a lawyer simultaneously could play three roles in a real estate transaction: (1) representing a client who wished to buy or sell real estate; (2) acting as the real estate broker; and (3) acting as the "mortgage broker or loan officer." OSB Formal Opinion 2006-176. The opinion concluded that playing those three roles simultaneously would create a current conflict under RPC 1.7(a)(2) because "there is a significant risk that these other roles would interfere with Lawyer's representation of Client." The opinion also stated that "Lawyer's interest in fees or income from these other roles, if not also Lawyer's liability concerns from those other roles, would create a significant risk that Lawyer's ability to 'exercise independent professional judgment and render candid advice' (Oregon RPC 2.1) would be compromised."

The Bar's 2006 opinion considered whether a lawyer can play three roles simultaneously.[12] Two of those roles would appear to be directly adverse (representing the buyer in a real estate transaction and acting as the loan officer for the lender in that transaction). Additionally, acting as the seller's broker could impose disclosure and other obligations on the lawyer that conflict with the lawyer's obligations to his client. *See* State Bar of Cal., Standing Comm on Prof'l

However, the Bar's RPC 1.7(a) claim in this case rests solely on the accused's interest in recovering a sales commission, and we limit our decision on RPC 1.7(a) to that issue.

[12] The Bar's opinion appears to treat buyers' and sellers' real estate agents as if they were interchangeable. As discussed more fully in the California ethics opinion on which the Bar relies, buyers' and sellers' real estate agents may have different obligations in the transaction with the result that those differing roles may raise different conflict-of-interest questions.

Responsibility and Conduct, Formal Opinion No. 1982-69 (1989). Finally, it is worth noting that the Bar's opinion did not rely solely on the financial incentive from those other two roles (real estate broker and loan officer) in concluding that a current conflict existed. It also factored a lawyer's concerns about liability from those roles into its conclusion that a significant risk of limiting a lawyer's ability to exercise independent judgment existed. The broad combination of circumstances and considerations that underlie the Bar's ethics opinion undercuts its persuasive value in considering the narrow circumstance on which the Bar's current claim against the accused rests.

The California ethics opinion, on which the Bar also relies, concludes that, when a lawyer serves as both a legal adviser and a broker, four considerations create a current conflict: (1) a broker's duty of disclosure may conflict with a lawyer's duty of confidentiality; (2) a lawyer's duty of loyalty may conflict with the expectation that the seller's broker can provide advice to or represent both sides of the real estate transaction; (3) the potential for receiving a commission "might lead the attorney to encourage consummation of the transaction on terms and conditions which the attorney might not endorse"; and (4) the obligation for a seller's broker to share the commission could run afoul of the prohibition against sharing fees. Cal Formal Opinion No. 1982-69 (1989). The California opinion identified all four considerations in concluding that a current conflict would exist; it did not focus solely on the possibility of receiving a commission, as the Bar does in this case.

The 2012 New York ethics opinion on which the Bar relies comes closer to the mark. *See* NY State Bar Ass'n Comm. on Prof'l Ethics, Formal Op 919 (2012). That opinion states that "a lawyer should not have a personal stake in the advice rendered, and a broker who is paid only if the transaction closes cannot be fully independent in advising the client as a lawyer." *Id.* (internal quotation marks omitted). The opinion bases that statement on a series of cases that find their source in a 1971 ethics opinion, NY State Bar Ass'n Comm. on Prof'l Ethics, Formal Op 208 (1971). *See* NY Ethics Op 919.

The 1971 opinion relied on two rationales for find-ing a conflict. The initial rationale—that lawyers may not use a business, such as a brokerage service, to solicit clients for their law practice—has been undercut by more recent decisions recognizing that lawyers have a First Amendment right to advertise their services. *See* NY Ethics Op 208 (stating that rationale); Cal Formal Opinion No. 1982-69 (recognizing that that rationale has been undercut by later decisions).[13] The 1971 New York ethics opinion noted, as a subsidiary rationale, that there was a "possible conflict between [the] client's and [the lawyer's] own personal inter-est," a conflict that the opinion grounded in both the prospect of recovering a sales commission and the lawyer's later act of suing his client for it. NY Ethics Op 208. With the loss of the primary rationale for its conclusion, the subsidiary rationale in the 1971 opinion has become the sole rationale for the conclusion that the 2012 New York ethics opinion reaches.[14] The Kentucky ethics opinion the Bar cites reaches a simi-lar conclusion. Bar Ass'n, Op KBA E-408 (1999). Although we appreciate the conclusions that New York and Kentucky have reached, we come to a different conclusion from those two jurisdictions, for the reasons stated above.

The Bar appears to advance a second, retrospective argument. The Bar recounts the events that surrounded Smith-Canfield's purchase of her home—namely, the advice that the accused gave Smith-Canfield in structuring the offer and the problems that she experienced after the city notified her of the code violation. The Bar reasons that the problems that Smith-Canfield experienced demonstrate that the accused put his own interest in obtaining a sales commission ahead of his obligation to protect his client's interests. We question, as an initial matter, whether that

---

[13] The California ethics opinion explained that, historically, the prohibition against lawyers acting as both legal advisors and brokers primarily reflected a "concern that attorneys might use the non-lawyer occupation as a basis for advertising and solicitation, with the rendering of non-lawyer services acting as a 'feeder' of clients for the law practice." Cal Formal Opinion No. 1982-69. It also recognized that that primary concern has been undercut by First Amendment decisions recognizing lawyers' free-speech interests in advertising their services. *Id.*

[14] A 2002 ethics opinion drew the conclusion from the 1971 ethics opinion that the 2012 ethics opinion repeats. *See* NY State Bar Ass'n Comm. on Prof'l Ethics, Formal Op 753 (2002).

sort of retrospective analysis is logically correct. The fact that a client later experiences problems does not necessarily mean that there was a "significant risk" of a conflict at the inception of the attorney-client relationship or that any risk that may have existed gave rise to the problems the client experienced; the problems may have resulted from a completely different cause. We need not decide that larger, methodological question, however, to resolve the Bar's retrospective argument here. In this case, the Bar has failed to persuade us that the problems Smith-Canfield later experienced in fact derived from the specific risk that the Bar alleged—the risk that the accused's interest in recovering a share of the sales commission would materially limit his representation of Smith-Canfield.

As we understand the Bar's argument, it starts from the premise that a reasonable lawyer would have recommended that Smith-Canfield have a professional inspection, which would have disclosed the city code violation. However, the only testimony in the record is that a professional inspection would not have disclosed the city code violation.[15] Moreover, the accused explained why he did not recommend a professional inspection in this instance (the fact that the house was relatively new and Smith-Canfield could not afford a professional inspection). At the hearing, the Bar offered no direct evidence that the accused's stated reason for recommending that Smith-Canfield waive a professional inspection was not the reason that motivated him. Rather, all that the Bar has pointed to is the accused's prospect of recovering a share of the sales commission if the sale closed, and it infers that that prospect caused the accused to recommend that Smith-Canfield waive her right to ask for a professional inspection.

As an abstract matter, we might question whether the accused should have taken additional steps, as his client's lawyer, to protect her interests in purchasing a home. On this record, however, the inference that the Bar draws is a weak one. Considered as a whole, the record does not

---

[15] The accused testified, and the Bar offered no contrary testimony, that a professional inspection would have revealed the presence of dry rot and the like but that it would not have revealed the city code violation that later came to light.

provide persuasive support for the Bar's argument that the problems that followed Smith-Canfield's purchase of her home stemmed from the accused's interest in recovering a share of the sales commission. Put differently, the sequence of events surrounding Smith-Canfield's purchase of her home does not persuade us that the prospect of recovering the sales commission materially limited the accused's representation of Smith-Canfield. That, however, is the only ground that the complaint alleged for finding that the accused had a current conflict under RPC 1.7(a)(2). Given the complaint's limited focus, we conclude that the Bar has not established that the accused violated RPC 1.7(a).

We note that RPC 1.8(a) requires that a lawyer who wishes to serve as his or her client's broker in a real estate transaction provide the requisite disclosure and receive the client's informed consent before doing so. If, as other jurisdictions have held, additional aspects of a real estate transaction (on which the Bar does not rely here) can result in a current conflict under RPC 1.7(a)(2), careful lawyers who seek to serve as both a client's legal advisor and broker in the same real estate transaction would be advised to satisfy the advice and consent requirements of both RPC 1.8(a) and RPC 1.7(b). *See* ABA Model Rules, Rule 1.8, comment [3] (recognizing that the same transaction can implicate both rules and require that both consent requirements be satisfied).[16]

## IV.  SANCTION

Having concluded that the accused violated only RPC 1.8(a), we turn to appropriate sanction.

> "We first consider the duty violated, the accused's state of mind, and the actual or potential injury caused by the accused's conduct. We next decide whether any aggravating

---

[16] Starting from the proposition that both lawyers and real estate brokers owe similar fiduciary duties to their clients, the accused argues that it would violate Article I, section 20, of the Oregon Constitution to treat a broker's prospect of receiving a sales commission differently from a lawyer's prospect of receiving a contingency fee. Because our interpretation of RPC 1.8(a) does not turn on the prospect of receiving a commission, the accused's Article I, section 20, argument has no application to that holding. Because we hold that the Bar has not proved a violation of RPC 1.7(a), we need not reach the accused's Article I, section 20, defense to that claim.

or mitigating circumstances exist. Finally, we consider the appropriate sanction in light of this court's case law. In determining the appropriate sanction, our purpose is to protect the public and the administration of justice from lawyers who have not discharged properly their duties to clients, the public, the legal system, or the profession."

*In re Renshaw*, 353 Or 411, 419, 298 P3d 1216 (2013) (internal citations omitted).

### A.  *Duty Violated*

In violating RPC 1.8(a), the accused violated his duty to Smith-Canfield to avoid conflicts of interest. American Bar Association's *Standards for Imposing Lawyer Sanctions* (ABA Standards) 4.3 (1991) (amended 1992); *see also* RPC 1.8 (Rules of Professional Conduct categorize RPC 1.8 as involving "Conflict[s] of Interest: Current Clients: Specific Rules").

### B.  *Mental State*

In violating RPC 1.8(a), the accused acted knowingly; that is, he demonstrated a conscious awareness of the nature or attendant circumstance of his conduct, but without the conscious objective or purpose to accomplish a particular result. ABA Standards at 7; *In re Schenck*, 345 Or 350, 369, 194 P3d 804 (2008) (a lawyer acts knowingly when the lawyer is consciously aware of essential facts giving rise to violation, even if the lawyer does not think his or her conduct violates any rule).

### C.  *Actual or Potential Injury*

We have concluded that the accused violated RPC 1.8(a) when he entered into a business transaction with Smith-Canfield without advising her to seek independent legal advice and giving her reasonable opportunity to do so, and without obtaining her written consent. That rule violation caused potential injury to Smith-Canfield, because she was denied the opportunity to consider the extent to which the business transaction might place the accused in an advantageous position or permit him to engage in overreaching, or to consult independent counsel in that regard. That rule violation also caused actual injury to Smith-Canfield. Much of the accused's advice to Smith-Canfield was based

on his determination that the real estate transaction was a good business deal that, in the accused's view, posed little risk. If the accused had clarified the role he was playing in the transaction and advised Smith-Canfield to seek independent legal advice, as RPC 1.8(a) requires, Smith-Canfield could have obtained advice from a lawyer who focused separately on protecting her legal interests, without balancing, as the accused did, the legal risks the transaction entailed against the business benefits it offered. We conclude that the accused's failure to distinguish the two roles led to his client's experiencing actual harm.

D.  *Preliminary Sanction*

As noted, the accused's misconduct under RPC 1.8(a) implicated ABA Standard 4.3, which applies to conflicts of interest. Under Standard 4.32, "[s]uspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose the possible effect of that conflict, and causes injury or potential injury to a client." That standard generally applies here.

E.  *Aggravating and Mitigating Circumstances*

The Bar argues that four aggravating circumstances apply. We agree that two aggravating circumstances apply. The accused has been disciplined before. *See* ABA Standard 9.22(a). In 2002, this court suspended the accused for 60 days for violating *former* DR 1-102(A)(3) (dishonesty, deceit, and misrepresentation) after he assisted clients in registering a motor home in Oregon when the clients did not reside in Oregon, and *former* DR 9-101(C)(4) (failure to return client property) for failing to return property to a different, potential client. *In re Spencer*, 335 Or 71, 58 P3d 228 (2002). We assign moderate weight to those ethical violations, given that there is more than one and that the accused had been sanctioned for those offenses before engaging in the misconduct at issue here. *See In re Jones*, 326 Or 195, 200, 951 P2d 149 (1997) (listing the factors to consider in determining the weight to give prior ethical violations). Additionally, the accused has substantial experience in the practice of law. *See* ABA Standard 9.22(i).

The trial panel found that the accused had acted with a dishonest or selfish motive, ABA Standard 9.22(b), because his "selfish interest in earning a commission in [Smith-Canfield's] purchase of her residence motivated him to engage in the violations at hand." We agree that the accused had a financial interest in the business transaction, in the form of his real estate commission, but the record does not show that that financial interest caused him either not to make the required disclosures to Smith-Canfield or to fail to obtain her written consent. We therefore decline to apply that factor.

The Bar argues that Smith-Canfield was a vulnerable victim because she was an unsophisticated client in desperate financial circumstances. *See* ABA Standard 9.22(h). The accused points out, however, that Smith-Canfield was not an unsophisticated purchaser. She had owned real property before and, at the time of the events at issue, was working as the controller for an automobile dealership. In the course of that work, she regularly handled financial matters. We decline to apply the "vulnerability of victim" aggravating factor.

One mitigating factor applies. The assistant disciplinary counsel testified at the trial panel hearing that the accused "absolutely" had cooperated in the Bar's investigation. ABA Standard 9.32(e).

F.   *Case Law*

This court has decided a number of cases involving a single violation of *former* DR 5-104(A), the predecessor business transactions rule. In *In re Montgomery*, 292 Or 796, 643 P2d 338 (1982) (*Montgomery I*), the court imposed a public reprimand on a lawyer who had obtained an unenforceable loan from a client with financial expertise without making appropriate disclosures, when the client reasonably had relied on the lawyer to exercise independent legal judgment. In *In re Whipple*, 296 Or 105, 116, 673 P2d 172 (1983), the court determined that a three-month suspension was warranted for misconduct similar to that in *Montgomery I* because the client in *Whipple*—unlike the client in *Montgomery I*— had not been an "astute, knowledgeable businessman." *See*

*also In re Baer*, 298 Or 29, 688 P2d 1324 (1984) (60-day suspension, when a lawyer purchased a home at the same time as representing the sellers in the transaction and violated a different conflict-of-interests rule); *In re Brown*, 277 Or 121, 559 P2d 884 (1977) (30-day suspension for violations of the business transactions rule and another conflicts rule, involving a lawyer's ongoing business relationship with a client and the client's estate; no evidence that the lawyer acted fraudulently or absconded with any funds). Finally, in *In re Montgomery*, 297 Or 738, 687 P2d 157 (1984) (*Montgomery II*), the court imposed a seven-month suspension on the same lawyer in *Montgomery I*, after he purchased a client's building using complex financing arrangements that created a risk that the client would not receive full payment of the agreed sales price, and did not make full disclosures to the client.

Longer suspensions are appropriate for multiple rule violations, where the misconduct involved self-interest and caused injury. *See Schenck*, 345 Or at 367-72 (one-year suspension, when the lawyer entered into a loan agreement with a client without obtaining consent in writing, together with other rule violations); *In re Wittemyer*, 328 Or 448, 980 P2d 148 (1999) (120-day suspension, when a lawyer persuaded a widowed client to loan substantial sums to a business for which he served as general counsel); *In re Gildea*, 325 Or 281, 926 P2d 975 (1997) (four-month suspension, when the lawyer failed to account for client property and engaged in a self-interest conflict and a business transaction with a client); *In re O'Byrne*, 298 Or 535, 694 P2d 955 (1984) (four-month suspension for multiple rule violations, including the failure to make full disclosure or advise clients to seek independent legal advice before entering into a joint business venture with them; a longer suspension was not warranted because no fraud or dishonesty was involved).

G.   *Sanction*

This case involves a single violation of RPC 1.8(1)(a). Unlike most cases decided under *former* DR 5-104(A), the accused's misconduct did not involve nondisclosure or lack of consent regarding a financial transaction in which the accused's role was directly adverse to or intertwined with

the client's, such as obtaining a loan from a client, engaging in a real estate transaction with a client that involved both the buyer and the seller, or commencing a joint business venture. If no aggravating factors applied and if Smith-Canfield had not suffered actual injury, a public reprimand might be an appropriate sanction. However, the accused's prior violations coupled with the injury to Smith-Canfield persuade us that a 30-day suspension is appropriate.

The accused is suspended from the practice of law for a period of 30 days, commencing 60 days from the filing of this decision.